## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

VINTAGE RODEO PARENT, LLC, a Delaware limited liability company, VINTAGE RODEO ACQUISITION, INC., a Delaware corporation, and VINTAGE CAPITAL MANAGEMENT, LLC, a Delaware limited liability company,

        Plaintiffs,

   and

B. RILEY FINANCIAL, INC., a Delaware corporation,

        Intervenor-Plaintiff,

  v.

RENT-A-CENTER, INC., a Delaware corporation,

        Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

C.A. No. 2018-0927-SG

RENT-A-CENTER, INC., a Delaware corporation,

        Counterclaim-Plaintiff,

  v.

VINTAGE RODEO PARENT, LLC, a Delaware limited liability company,

   and

B. RILEY FINANCIAL, INC., a Delaware corporation,

        Counterclaim-Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**MEMORANDUM OPINION**

Date Submitted: March 11, 2019
Date Decided: March 14, 2019

William B. Chandler III, Bradley D. Sorrels, Shannon E. German, and Andrew D. Berni, of WILSON SONSINI GOODRICH & ROSATI, P.C., Wilmington, Delaware; William M. Lafferty, Thomas W. Briggs, Jr., and Richard Li, of MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; OF COUNSEL: David J. Berger and Katherine Henderson, of WILSON SONSINI GOODRICH & ROSATI, P.C., Palo Alto, California; Tariq Mundiya, Jeffrey Korn, Sameer Advani, and Shaimaa Hussein, of WILLKIE FARR & GALLAGHER LLP, New York, New York, *Attorneys for Plaintiffs Vintage Rodeo Parent, LLC, Vintage Rodeo Acquisition, Inc., and Vintage Capital Management, LLC*.

David E. Ross and S. Michael Sirkin, of ROSS ARONSTAM & MORITZ LLP, Wilmington, Delaware; OF COUNSEL: Bruce Van Dalsem, William C. Price, and Scott B. Kidman, of QUINN EMANUEL URQUHART & SULLIVAN, LLP, Los Angeles, California; Andrew J. Rossman, Jane M. Byrne, Corey Worcester, Ellyde R. Thompson, Guyon H. Knight, Elisabeth B. Miller, and Hope D. Skibitsky, of QUINN EMANUEL URQUHART & SULLIVAN, LLP, New York, New York, *Attorneys for Intervenor-Plaintiff B. Riley Financial, Inc.*

Michael A. Pittenger, T. Brad Davey, Matthew F. Davis, Jaqueline A. Rogers, and Caneel Radinson-Blasucci, of POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; OF COUNSEL: John W. Spiegel, George M. Garvey, Robert L. Dell Angelo, and John M. Gildersleeve, of MUNGER, TOLLES & OLSON LLP, Los Angeles, California, *Attorneys for Defendant Rent-A-Center, Inc.*

GLASSCOCK, Vice Chancellor

Plaintiff Vintage Capital Management, LLC ("Vintage Capital) indirectly owns stores offering consumer goods to the public under the trade name "Buddy's." Buddy's is a "rent-to-own" retailer. This business model offers consumers an alternative to paying for goods with cash or credit, and taking immediate title. Under the rent-to-own model, as I understand it, the consumer "rents" the item, the seller retains title, the consumer makes payments denominated "rental payments," which contain an amount of principal payment, and if the consumer is able to complete the contractual payments, title is then transferred to the consumer. Vintage Capital, through two affiliates (collectively with Vintage Capital, "Vintage" or the "Vintage Entitities"), entered a merger agreement to acquire Defendant Rent-A-Center, Inc. ("Rent-A-Center"), a bigger player in the rent-to-own market. Because of the overlap of these competing retail operations, the parties knew that Federal Trade Commission ("FTC") permission would be required for the merger, and that the review process could be lengthy. Therefore, in a vigorously negotiated provision, the merger agreement provided an "End Date," six months from signing, after which either party could terminate the merger agreement. If, however, the FTC review process was still ongoing, each party negotiated for itself the unilateral right to extend the End Date for three months (and a second time for an additional three months), by giving the other side notice of the election to extend before the original End Date. By doing so, the extending party was binding both its counterparty and

itself to compliance with the merger terms during the extension period. If neither party chose to extend the End Date, the merger was not terminated once that date had passed—both parties were still bound by the merger agreement, but either could terminate at will, simply by giving notice.

Thus, as the End Date approached, each party had a set of decisions to contemplate. It could give notice of election to extend, in which case both it and its counterparty would be bound to use commercially reasonable efforts to close during the extension period before the new End Date. If it chose not to extend, the party would nonetheless continue to be so bound if the counterparty gave notice of election to extend.

If neither party gave the required notice, the parties were free to proceed to closing, but with the knowledge that either party had the right to terminate at will before closing.

These decisions were complicated by another bargained-for set of provisions, involving breakup fees. If Vintage chose not to extend the End Date, it (and its banker, B. Riley Financial, Inc. ("B. Riley"), an intervenor here) was (at least per Rent-A-Center) liable for a reverse breakup fee if either party terminated thereafter. Adjectives are often misplaced in legal opinions; nonetheless, I am comfortable

2

describing the size of the reverse breakup fee, in light of the entity to be acquired, as enormous.[1]

At a meeting of Rent-A-Center's Board of Directors (the "Board") shortly before the End Date, the Board was given a presentation by corporate counsel. According to counsel, the Board was faced with the decision matrix described above: whether it should unilaterally extend the End Date, and if not—and if Vintage chose not to extend—should it immediately cancel the merger, or proceed towards closing? The Rent-A-Center Board determined that it was, by that point, no longer in the corporate interest to proceed under the terms of the merger agreement. It decided, therefore, not to elect extend the End Date, and, should Vintage not elect to extend, to terminate the merger. The Rent-A-Center Board was told by counsel that it was likely that Vintage would extend, given, I assume, market conditions and the reverse breakup fee. In that case, Rent-A-Center would be bound to continue to use commercially reasonable efforts to obtain FTC approval and consummate the

---

[1] The reverse termination fee here is $126.5 million, or 15.75% of the equity value ($803 million) of the prospective transaction. *See* JX 691 (Expert Report of Professor Guhan Subramanian) ¶ 19. According to the report of the Plaintiffs' expert, Professor Subramanian, 15.75% is two to three times higher than average in comparable deals. *See* JX 691 ¶¶ 43–69. By contrast, the Defendant's expert, Professor Rock, notes, among other things, that while the reverse termination fee here is above average, reverse termination fees are necessarily deal-specific and that there are examples of reverse termination fees within the same range as the one at issue here. *See* JX 696 (Expert Report of Edward B. Rock) ¶¶ 80, 81. I note, however, that this Court has generally found termination fees of around 3% to be reasonable, subject to deal-specific factors. *See, e.g.*, *McMillan v. Intercargo Corp.*, 768 A.2d 492 (Del. Ch. 2000); *In re Pennaco Energy, Inc.*, 787 A.2d 691 (Del. Ch. 2001); *In re Toys "R" US, Inc. S'holder Litig.*, 877 A.2d 975 (Del. Ch. 2005); *La. Municipal Police Emps.' Ret. Sys. v. Crawford*, 918 A.2d 1172 (Del. Ch. 2007); *In re Dollar Thrifty S'holder Litig.*, 14 A.3d 573 (Del. Ch. 2010).

merger. If Vintage made the surprising decision not to give notice of an election to extend, Rent-A-Center was ready to exercise its resulting right to terminate, immediately. As it happened, Vintage failed to give notice of an election to extend, and a few hours later, Rent-A-Center gave the notice required to terminate the merger agreement.

Vintage Capital was blindsided. In this litigation, it seeks relief including a declaration that Rent-A-Center's notice of termination was ineffective, and an order that the parties must proceed to obtain FTC approval and merge. If that is to occur, it is apparent that it must happen quickly; therefore, Vintage pursued this action on an expedited basis. This matter was tried for two days, post-trial argument followed quickly on March 11, 2019, and this partial (and rough-and-ready) decision is the result.

Vintage Capital makes a number of arguments, but principally two, which I find somewhat in tension. First, Vintage asserts that it and Rent-A-Center took numerous actions during the six months following execution of the merger agreement that were intended to achieve regulatory approval, and that these actions and the accompanying joint documents executed by Rent-A-Center and the Vintage Entities made clear that Rent-A-Center expected the merger to close after the End Date. Therefore, per Plaintiffs, Vintage had (through the joint documents) adequately given notice of its election to extend, or the extension notice provision

4

had lost its relevance (and enforceability) in light of both parties' intent to proceed past the End Date, or Rent-A-Center had, through its actions, waived the notice of election to extend. The problem, in my view, with these assertions, is that the parties' activities are consistent with their obligations to use commercially reasonable efforts to obtain FTC approval and close; the ability of the counterparty to extend the End Date unilaterally meant that the parties were required to plan for such activities beyond the original End Date. Therefore, these documents and actions are not inconsistent with an intention to terminate, if such an opportunity became available. As such, they are insufficient to bind the parties under the theories set out above; they are consistent with the merger agreement, which contemplated, but did not require, extension of the End Date.

The other theory the Plaintiffs advance is that Rent-A-Center's behavior was, in effect, fraudulent. Once the Rent-A-Center Board determined, less than two weeks before the original End Date, that it was in the company's interest not to merge with Vintage, Rent-A-Center concealed its intent by continuing to act as though it were willing to consummate the merger. The Rent-A-Center Board, in this view, was hoping that Vintage would choose not to—or would forget to—give notice of extension. If Rent-A-Center had conveyed its real intent to Vintage, or at least acted like a reluctant merger partner, Vintage would have been more scrupulous in exercising its right to extend, presumably by giving the notice required by the

merger agreement. While Vintage couches this as a breach of Rent-A-Center's duty to use commercially reasonable efforts to close, this strikes me as the equivalent of a "duty to warn" Vintage of the approaching End Date, which Vintage itself does not contend exists under law or under the merger agreement. More fundamentally, Rent-A-Center had no reason to believe that Vintage had forgotten or misunderstood its options under the merger agreement, and it believed that Vintage Capital would extend; therefore, Rent-A-Center would continue to be required to expend commercially reasonable efforts toward closing going forward. I find its behavior to be consistent with that understanding.

It is, I find, telling what the Plaintiffs did not present at trial. The Plaintiffs did not attempt to explain why they did not deliver notice of their election to extend, as called for in the merger agreement. They presented no evidence, for example, indicating that Vintage's principals considered the approaching End Date and the contractual option to elect extension, but concluded it would not be necessary to give written election notice out of the belief that Vintage had already bound Rent-A-Center for an additional three months, or that Rent-A-Center had waived notice of election to extend. To the contrary, Vintage's arguments are after-the-fact rationalizations as to why failure to give written notice of election to extend is excused. I am left to the startling conclusion that, having vigorously negotiated a provision under which Vintage was entitled to extend the End Date simply by

6

sending Rent-A-Center notice of election to do so by a date certain, Vintage and B. Riley personnel, in the context of this $1 billion-plus merger, simply forgot to give such notice. As one B. Riley principal messaged another, immediately upon learning of the failure of notice, "We are [prejudiced in the extreme]."[2] This attempt by the Plaintiffs to demonstrate that Rent-A-Center nonetheless was not free to terminate followed.

At bottom, the Plaintiffs' argument is that they were working in good faith toward a 2019 closing, which was expected to occur only after the first End Date, and that Rent-A-Center made it abundantly clear that it was working toward the same goal. Both parties had committed much time and effort in that regard, as required by the merger agreement. Under these circumstances, per the Plaintiffs, it is unfair to allow Rent-A-Center to exercise the letter of its bargained-for rights and walk away from the contract, because of a mistaken failure by Vintage to exercise a right that Rent-A-Center must have known Vintage wanted to exercise. I find, however, that the End Date, and the methods to extend it, were matters of importance to the parties, and were heavily negotiated. The parties are bound to their contractual bargain. And a finding that contractually-required expenditures of time and effort

---

[2] JX 39, at 155 (expletives modified in accordance with context). In fact, the message employed an Anglo-Saxon expression that, while generally unfit for publication, when used metaphorically has many meanings. I am convinced from context, however, that the meaning the message attempted to express was "prejudiced in the extreme." I note that Vintage's principal had a different reaction; in a text to his partner, he wrote: "No idea what [Rent-A-Center's] thinking. They know its [sic] extended." JX 870.

made, before the End Date, equated to sufficient notice of election to extend, would fundamentally rewrite the bargain of the parties. I explain my reasoning below.

Also pending before me is B. Riley's argument that the reverse breakup fee is untethered to actual damages, and is, therefore, unenforceable. Because of the need to issue my decision quickly in this expedited matter, I have not resolved that issue here. At the end of this Memorandum Opinion, I lay out the issues regarding the reverse breakup fee, and seek additional briefing on whether the implied covenant of good faith and fair dealing should apply to liability for a reverse break fee in these circumstances, where the buyer remains willing and able to proceed toward closing.

## I. BACKGROUND

Trial took place over two days, during which eight witnesses gave live testimony. The parties submitted over seven hundred exhibits and lodged eighteen depositions, as well as competing expert reports. The following facts were stipulated by the parties[3] or proven by a preponderance of the evidence at trial.

*A. The Parties*

1. The Vintage Entities

Plaintiff Vintage Capital is a Delaware limited liability company with its principal place of business in Orlando, Florida.[4] Vintage Capital's managing partner

---

[3] The parties stipulated certain facts in their Joint Pre-Trial Stipulation and Order ("Pre-Trial Order"). I commend the parties for the excellent craftsmanship at trial and in briefing, made all the more remarkable given these expedited proceedings.

[4] Pre-Trial Order ¶ II.A.1.

is Brian Kahn ("Kahn").[5]  Vintage Capital is the controlling stockholder of Buddy's Newco, LLC d/b/a Buddy's Home Furnishings ("Buddy's").[6]  Buddy's, in turn, is a privately held operator and franchisor of rent-to-own stores, and has close to three hundred locations across the United States and Guam.[7]

Plaintiff Vintage Rodeo Parent, LLC ("Vintage Parent")[8] is a Delaware limited liability company.[9]  Vintage Parent is an affiliate of Vintage Capital.[10] Plaintiff Vintage Rodeo Acquisition, Inc. ("Vintage Merger Sub") is a Delaware corporation, and the wholly-owned subsidiary of Vintage Parent.[11]  Vintage Parent and Vintage Merger Sub were formed for the purpose of acquiring Defendant Rent-A-Center through a merger of Vintage Merger Sub and Rent-A-Center (the "Merger").[12]  Vintage Capital, Vintage Parent, and Vintage Merger Sub are, again, collectively referred to as "Vintage" or the "Vintage Entities."

2. B. Riley Financial, Inc.

Intervenor-Plaintiff B. Riley Financial, Inc.[13] is a publicly traded Delaware corporation with its principal place of business in Woodland Hills, California.[14]  B.

---

[5] Kahn Dep. 13:6–13:8.
[6] Pre-Trial Order ¶ II.A.1.
[7] *Id.*
[8] Vintage Parent is also a Counterclaim-Defendant.
[9] Pre-Trial Order ¶ II.A.2.
[10] *Id.*
[11] *Id.* ¶ II.A.3.
[12] *Id.* ¶¶ II.A.2, II.A.3; *see also* JX 272.
[13] B. Riley is also a Counterclaim-Defendant.
[14] Pre-Trial Order ¶ II.A.4.

Riley's Chairman and CEO is Bryant Riley ("Mr. Riley").[15]  B. Riley is a financial services company.[16]  B. Riley and Vintage Capital have previously worked together on a number of investments.[17]  Here, B. Riley arranged debt and equity financing for the Merger.

### 3. Rent-A-Center, Inc.

Defendant Rent-A-Center[18] is a publicly traded Delaware corporation with its principal place of business in Plano, Texas.[19]   Rent-A-Center operates approximately 2,400 rent-to-own stores in the United States, Mexico, Canada, and Puerto Rico, and is the franchisor of approximately 250 rent-to-own stores.[20]  In addition to stores, Rent-A-Center operates approximately 1,250 kiosks in the stores of third-party retailers, where the third-party retailers' customers can obtain rent-to-own financing through Rent-A-Center's Acceptance Now operating segment ("Acceptance Now").[21]

---

[15] Trial Tr. 301:20–302:9 (B. R. Riley).
[16] *Id.* at 303:1–304:17 (B. R. Riley).
[17] *Id.* at 27:23–28:7 (Kahn); *id.* at 306:4–307:7 (B. R. Riley).
[18] Rent-A-Center is also a Counterclaim-Plaintiff.
[19] Pre-Trial Order ¶ II.A.5.
[20] *Id.*
[21] *Id.*; JX 66, at 53.

*B. The Rent-A-Center Sales Process and Negotiation of the Merger Agreement with Vintage*

### 1. Rent-A-Center Pursues a Sale

In 2017, a Rent-A-Center stockholder, Engaged Capital, ran a successful proxy contest to elect nominees to Rent-A-Center's Board.[22] Engaged Capital's slate included Mitch Fadel ("Fadel"), a longtime Rent-A-Center employee who had left the company in 2015.[23] As a result, Fadel was elected to Rent-A-Center's Board of Directors in June 2017.[24] Around the same time, Vintage Capital sent Rent-A-Center an unsolicited bid to acquire all of Rent-A-Center's common stock for $15 per share, but Rent-A-Center's Board decided not to pursue the bid.[25]

At the end of October 2017, Rent-A-Center's Board designated certain directors, including Fadel, to serve on a steering committee to advise the Board on strategic alternatives, including the possibility of a sale.[26] The Board hired J.P. Morgan to help with the process.[27] On November 7, 2017, Vintage Capital sent another unsolicited proposal to Rent-A-Center, which was declined, given the early stage of the strategic review process.[28] In December 2017, J.P. Morgan, on behalf of the steering committee, identified and contacted thirty potential acquirors,

---

[22] JX 316, at 36; Trial Tr. 499:20–500:4 (Fadel).
[23] Trial Tr. 494:9–495:2, 499:20–500:4 (Fadel).
[24] JX 316, at 36; Trial Tr. 499:20–500:16 (Fadel).
[25] Pre-Trial Order ¶ II.A.6.
[26] *Id.* ¶ II.A.7; JX 316, at 37; Trial Tr. 508:1–10 (Fadel).
[27] Pre-Trial Order ¶ II.A.9; JX 316, at 36–39; Trial Tr. 501:8–19 (Fadel).
[28] Pre-Trial Order ¶ II.A.8; JX 316, at 37.

including Vintage Capital.[29]  At the end of 2017, Rent-A-Center's CEO retired, and Fadel became CEO on January 2, 2018.[30]

Of the thirty parties contacted by J.P. Morgan, eleven signed non-disclosure agreements ("NDAs") with Rent-A-Center, including Vintage Capital.[31] Discussions with potential acquirors continued into 2018.[32]  Only three potential acquirors were considered serious bidders; by May 2018, two of the serious bidders had effectively dropped out, leaving Vintage Capital as the sole potential acquiror.[33] On June 10, 2018, Rent-A-Center publicly announced it was terminating its strategic review process, and on the same day, Vintage Capital made an acquisition offer of $14 per share.[34]  After further discussion, on June 17, 2018, Vintage Capital raised its offer to $15 per share in cash, a forty-seven percent premium over Rent-A-Center's closing price on October 30, 2017.[35]  Vintage Capital's offer represented "total consideration of approximately $1.365 billion, including net debt."[36]  After receiving J.P. Morgan's opinion, the Rent-A-Center Board voted unanimously to approve the transaction with Vintage Capital, and the parties executed the

---

[29] Pre-Trial Order ¶ II.A.9.

[30] JX 316, at 38; Trial Tr. 502:8–17 (Fadel).

[31] Pre-Trial Order ¶ II.A.9.

[32] *Id.* ¶ II.A.10.

[33] *Id.* ¶¶ II.A.9, II.A.10; JX 316, at 38–44.

[34] Pre-Trial Order ¶ II.A.10.

[35] *Id.*  October 30, 2017 was the trading day before Rent-A-Center announced it was looking at strategic alternatives. *Id.*

[36] JX 263.

12

Agreement and Plan of Merger (the "Merger Agreement")[37] on June 17, 2018.[38] Rent-A-Center and Vintage Capital issued a joint press release the next day announcing the Merger; the press release stated that the Merger was "expected to close by the end of 2018."[39]

### 2. Vintage Capital Engages B. Riley to Finance the Transaction

On March 24, 2018, J.P. Morgan circulated a proposed merger agreement to the (at that point) three prospective acquirors.[40] During the negotiation period that followed, Vintage Capital engaged B. Riley to arrange "backstop" debt and equity financing for the prospective transaction.[41] As a result, B. Riley, and its subsidiary Great American Capital Partners, agreed to provide a large portion of the total debt and equity to finance the Merger.[42] Of the debt financing, $275 million was in the form of a "liquidation loan" from Great American Capital Partners, and was secured by Acceptance Now's assets.[43] In addition to providing debt and equity financing,

---

[37] The Plaintiffs cite to JX 272 for the Merger Agreement, and the Defendant cites to JX 227. JX 227 was the executed version on July 17, 2018; the following day, the parties corrected several formatting issues, and the Merger Agreement in JX 272 was the version filed with the SEC. *See* JX 272. The two versions are, in pertinent part, identical. I cite to JX 272 for convenience. I also note that, for purposes of clarity, I cite to the sections of the Merger Agreement rather than page numbers.

[38] Pre-Trial Order ¶ II.A.11; JX 227; JX 238; JX 266; JX 316, at 41, 48.

[39] JX 263.

[40] JX 316, at 40.

[41] *Id.* at 44. Mr. Riley explained at trial that "backstop" in this context meant that "if [B. Riley] could not syndicate [the debt] by the time the transaction closed, [B. Riley] would fund it off of [its] balance sheet." Trial Tr. 308:24–309:4 (B. R. Riley).

[42] JX 233; JX 315, at 65; JX 826, at 1; JX 828, at 1.

[43] Trial Tr. 27:15–22 (Kahn); *see also* JX 233, at 2.

13

B. Riley agreed to guarantee, among other things, a $126.5 million parent termination fee contained in the Merger Agreement, discussed at length below.[44]

*C. The Merger Agreement*

Rent-A-Center and Vintage Capital exchanged multiple drafts of the Merger Agreement between March 24, 2018, when Rent-A-Center first circulated a proposed merger agreement, and June 17, 2018, when the parties executed the Merger Agreement.[45] Given that Buddy's was one of Rent-A-Center's largest competitors,[46] the parties expected that the Merger would require antitrust clearance from the FTC; accordingly, the Merger Agreement specifically references the Hart-Scott-Rodino ("HSR") Act and the process of obtaining regulatory approval from the FTC.[47]

1. Commercially Reasonable Efforts

The parties, in various provisions of the Merger Agreement, contracted to use "commercially reasonable efforts" to take certain actions and to achieve certain goals, both general and specific. In Section 6.03, the parties agreed to use commercially reasonable efforts to take all action necessary under the Merger

---

[44] Pre-Trial Order ¶ II.A.13; JX 229. B. Riley executed the "Limited Guarantee" concurrent with the execution of the Merger Agreement. Pre-Trial Order ¶ II.A.13.

[45] *See* JX 44; JX 48; JX 59; JX 71; JX 78; JX 81; JX 86; JX 106; JX 110; JX 148; JX 159; JX 167; JX 172; JX 187; JX 199; JX 211; JX 225; JX 244; JX 245; JX 246; JX 250; JX 252; JX 255; JX 271.

[46] Pre-Trial Order ¶ II.A.1.

[47] *See, e.g.*, JX 272 §§ 6.18, 7.01(b).

Agreement to "consummate and make effective as promptly as practicable . . . the transactions contemplated by [the Merger Agreement]."[48] In Section 6.11(f), Rent-A-Center agreed to use commercially reasonable efforts to satisfy the conditions of the financing for the transaction, including specific actions, such as attending certain meetings and providing financial information.[49]

With regard specifically to obtaining antitrust approval for the Merger, in Section 6.18(a) the parties agreed to use commercially reasonable efforts both to make all filings and to take all steps to obtain government approval of the Merger.[50] The Merger Agreement specified certain of the steps, such as making a filing pursuant to the HSR Act within twenty days of the Merger Agreement.[51]

Vintage Parent and Vintage Merger Sub further agreed in Section 6.18(b) to use "commercially reasonably efforts to . . . promptly undertake . . . any and all action necessary or advisable to avoid, prevent, eliminate or remove the actual or threatened commencement of any action by . . . any Government Entity . . . that would . . . prevent the consummation of the Merger or the other transactions contemplated."[52] Section 6.18(b) is referred to as a "hell or high water" provision,[53]

---

[48] *Id.* § 6.04.
[49] *Id.* § 6.11(f).
[50] *Id.* § 6.18(a).
[51] *Id.*
[52] *Id.* § 6.18(b).
[53] *See* Trial Tr. 132:5–15 (Ferris) (A "hell or high water" provision is "[b]asically that the buyer had to remove every impediment to clearance, and every antitrust impediment to clearance.").

15

and it specifically included the possibility of Vintage Capital's divesture of Buddy's.[54]

## 2. Closing Date, Effective Time, and End Date

The "Closing Date" of the Merger Agreement is defined as the date on which the "Closing" occurs, and is further defined to occur on a date to be specified by Rent-A-Center and Vintage Parent following the "satisfaction or . . . waiver by the party . . . entitled to the benefits thereof of the conditions set forth in Article VII . . . ."[55] Article VII of the Merger Agreement sets out conditions precedent, such as Rent-A-Center stockholder approval of the Merger,[56] government consent for the merger,[57] material performance of the obligations of the parties,[58] and the lack of a Rent-A-Center material adverse effect,[59] among others.

On the Closing Date, the parties to the Merger Agreement are obligated to file a certificate of merger with the Delaware Secretary of State.[60] The Merger becomes

---

[54] JX 272 § 6.18(b) ("[Vintage Parent] and [Vintage Merger Sub] shall . . . use their respective commercially reasonable efforts . . . including (i) proffering and consenting and/or agreeing to an Order or other agreement providing for the sale . . . of particular assets . . . of Vintage Parent (or any of its Affiliates, including Buddy's Newco, LLC) . . . .").

[55] *Id.* § 1.03. The date specified, however, could be no later than the third business day following the satisfaction or waiver of the conditions in Article VII of the Merger Agreement. *Id.*

[56] *Id.* § 7.01(a).

[57] *Id.* § 7.01(b).

[58] *Id.* §§ 7.02(b), 7.03(b).

[59] *Id.* § 7.03(c).

[60] *Id.* § 1.02.

effective when the certificate is filed, or at a later time if specified in the certificate.[61] The time the merger becomes effective is defined as the "Effective Time."[62]

The "End Date" of the Merger Agreement is defined as "11:59 p.m., Eastern Time, on December 17, 2018."[63] According to Section 8.01(b)(i) of the Merger Agreement "either [Vintage Parent] or [Rent-A-Center] may elect (by delivering written notice to the other party at or prior to 11:59 p.m., Eastern time, on December 17, 2018) to extend the End Date to March 17, 2019," provided that the Effective Time has not occurred by the End Date and "the conditions set forth in Section 7.01(b) or Section 7.01(c) shall not have been satisfied . . . ."[64] Section 7.01(b) contains the condition that "[a]ny applicable waiting period under the HSR Act shall have expired or been earlier terminated and all other required consents under any Antitrust Laws shall have been obtained."[65] Section 7.01(c) contains the condition that no "Legal Restraint"[66] "is in effect and makes the Merger illegal or otherwise prevents the consummation of the Merger . . . ."[67] The End Date could be extended

---

[61] *Id.*
[62] *Id.*
[63] *Id.* § 8.01(b)(i).
[64] *Id.*
[65] *Id.* § 7.01(b).
[66] *See id.* § 7.01(c) ("No Government Entity of competent jurisdiction shall have enacted, issued, or promulgated any Law or granted any Order (whether temporary, preliminary or permanent) (collectively, the "Legal Restraints") . . . ." ).
[67] *Id.*

a further and final time, under the same conditions, at the election of either Vintage Parent or Rent-A-Center, from March 17, 2019 to June 17, 2019.[68]

### 3. Termination of the Merger Agreement

The Merger Agreement provides circumstances in Section 8.01 by which the Merger Agreement can be terminated prior to the Effective Time.[69] The circumstances include: by mutual written consent;[70] by Rent-A-Center or Vintage Parent upon written notice that the other party has breached a representation or failed to perform any covenant, such that Rent-A-Center stockholder approval or government consent to the Merger would not be obtained as of the Closing Date;[71] by Rent-A-Center or Vintage Rodeo if a Legal Restraint exists or Rent-A-Center stockholder approval is not obtained;[72] by Rent-A-Center if it receives a Superior Proposal[73] prior to Rent-A-Center stockholder approval;[74] by Vintage Parent upon written notice that Rent-A-Center's Board makes or fails to make certain recommendations;[75] and by Rent-A-Center if the conditions precedent in Article VII

---

[68] *Id.* § 8.01(b)(i). The election to extend again had to be by written notice and delivered "to the other party at or prior to 11:59 p.m., Eastern time, on March 17, 2019." *Id.*

[69] *Id.* § 8.01.

[70] *Id.* § 8.01(a)

[71] *Id.* § 8.01(c), (e).

[72] *Id.* § 8.01(b)(ii), (iii).

[73] "Superior Proposal" was a further defined term. *See id.*, at 77.

[74] *Id.* § 8.01(d).

[75] *Id.* § 8.01(f).

are satisfied or waived and Vintage Parent and Vintage Merger Sub fail to consummate the merger.[76]

The remaining circumstance in Section 8.01 under which the Merger Agreement can be terminated—and the primary focus of this action—is Section 8.01(b)(i), which reads:

> Section 8.01 <u>Termination</u>. This Agreement may be terminated prior to the Effective Time by action of [Rent-A-Center] or [Vintage Parent], as the case may be: . . .
> (b) by either [Rent-A-Center] or [Vintage Rodeo]:
> (i) upon written notice to the other party, whether before or after receipt of the Company Stockholder Approval, if the Merger shall not have been consummated by [the End Date] . . . .[77]

The right to terminate the Merger Agreement under Section 8.01(b)(i), however, is not available "to any party whose breach of any provision of [the Merger Agreement] causes the failure of the Closing to be consummated by the End Date."[78]

### 4. Termination Fees

The Merger Agreement provides for a termination fee under certain circumstances. Rent-A-Center agreed to a pay a termination fee of $25,300,000 to Vintage Parent for certain terminations described in Section 8.01, such as if Rent-A-Center terminated the Merger Agreement to pursue a different proposal, or if Vintage Rodeo terminated the Merger Agreement because Rent-A-Center's Board

---

[76] *Id.* § 8.01(g).
[77] *Id.* § 8.01(b)(i).
[78] *Id.*

made or failed to make certain recommendations.[79]  Vintage Parent agreed to pay a termination fee of $126,500,000 to Rent-A-Center for certain terminations described in Section 8.01 (the "Parent Termination Fee").[80]  Relevant here, Vintage Parent agreed to pay the Parent Termination Fee if "[the Merger Agreement] is terminated pursuant to Section 8.01(b)(i) and the conditions set forth in Section 7.01(b) shall not have been satisfied . . . ."[81]  Section 7.01(b), again, is the condition that the HSR Act waiting period has expired (or had been terminated) and all other antitrust approval has been obtained.[82]

### 5. Notice and Waiver Provisions

The Merger Agreement contained provisions on Waiver and Notice. According to Section 8.05, before the Effective Time, the parties could extend the time of performance of any obligation, waive inaccuracies in representations and warranties, waive compliance with covenants and agreements, and waive the satisfaction of conditions.[83]  "Any agreement on the part of a party to any such extension or waiver shall be valid only if set forth in an instrument in writing signed on behalf of such party."[84]

---

[79] *Id.* § 8.03(b).
[80] *Id.* § 8.03(c).
[81] *Id.* § 8.03(c)(i).
[82] *Id.* § 7.01(b).
[83] *Id.* § 8.05.
[84] *Id.*

20

Section 9.02 of the Merger Agreement provides the method, timing, and required addressees of notices and other communications.[85] According to Section 9.02, notices have to be in writing and are considered "duly given" on "the date of delivery if delivered personally" or on "the date sent if sent by facsimile or electronic mail," among other methods.[86] Section 9.02 requires that notices be delivered to specified addressees set forth in Section 9.02.[87] If the notice is being sent to Rent-A-Center, the addressees are Rent-A-Center, to the attention of its General Counsel, and separately to certain of its attorneys; if the notice is being sent to Vintage Capital, the addressees are Vintage Capital, to the attention of Kahn, and separately to certain of its attorneys.[88]

*D. Post-Signing Antitrust, Financing, and Integration Efforts*

The parties signed the Merger Agreement on June 17, 2018. On July 16, 2018, Rent-A-Center filed its Preliminary Proxy Statement with the SEC;[89] on August 15, 2018, Rent-A-Center filed its Definitive Proxy Statement on Schedule 14A regarding the proposed Merger.[90] On September 18, 2018, Rent-A-Center stockholders voted on and approved the Merger.[91] Before and after stockholder

---

[85] *Id.* § 9.02.
[86] *Id.*
[87] *Id.*
[88] *Id.*
[89] JX 283.
[90] Pre-Trial Order ¶ II.C.17; JX 315.
[91] Pre-Trial Order ¶ II.C.20. Prior to the stockholder vote, Vintage sent Rent-A-Center a notice of breach, in which Vintage claimed that Rent-A-Center breached Section 6.01(d) of the Merger

approval, Rent-A-Center and Vintage Capital worked together on: obtaining antitrust approval, pre-closing integration efforts and planning, and Vintage Capital's financing for the merger. While the June 18, 2018 press release first announcing the Merger contained an expectation that the Merger would "close by the end of 2018,"[92] subsequent press releases and the parties' work on antitrust approval, integration, and financing all reflected a prospective closing date in 2019.[93]

### 1. Antitrust Approval Efforts

The Merger Agreement required a filing in accordance with the HSR Act for antitrust approval from the FTC within twenty days of the date of the Merger Agreement.[94] The parties to the FTC filing were Rent-A-Center and Buddy's, as Buddy's was Rent-A-Center's competitor.[95] Rent-A-Center filed its FTC submission within the twenty days, but Buddy's failed to do so because of an administrative error.[96] Given the missed deadline, Vintage Parent requested a waiver, in compliance with Section 9.02's notice requirements, to which Rent-A-

---

Agreement by not scheduling a stockholder vote "as promptly as practicable after the SEC clears the Proxy Statement." JX 308 (internal quotations omitted); *see also* JX 272 § 6.01(d). Vintage later withdrew its notice of breach. JX 312. Both the notice of breach and the withdrawal notice complied with Section 9.02 recipient requirements. *See* JX 308; JX 312.

[92] JX 263.

[93] Rent-A-Center's own press releases contained the expectation that closing would occur in 2019. *See, e.g.*, JX 355; JX 477.

[94] JX 272 § 6.18(a).

[95] Trial Tr. 129:5–19, 169:12–20 (Ferris).

[96] *Id.* at 134:6–19 (Ferris).

Center agreed.[97]  Buddy's and Rent-A-Center then submitted their filing to the FTC.[98]

As described by the Plaintiffs and the Defendant,[99] under the HSR Act, prospective merger partners must submit a filing to the FTC, after which they cannot close their merger until a thirty-day "waiting period" has elapsed (or the FTC earlier terminates the waiting period).[100]  In other words, the FTC only has the length of the waiting period to make its decision.[101]  Before the end of the waiting period, the FTC may request additional information, known as a "second request."[102]  If merging parties receive a second request, they cannot close the merger until thirty days after they have complied with the request (again unless the FTC earlier terminates the waiting period), essentially extending the waiting period.[103]

In August 2018, the FTC signaled to the filing parties that it would issue a second request.[104]  Vintage Capital and Rent-A-Center decided to pull their FTC filings and then refile, in an effort to avoid a second request by resetting the thirty-

---

[97] JX 294; Trial Tr. 296:15–24 (Korst).
[98] JX 295; s*ee also* Trial Tr. 134:6–135:0 (Ferris).
[99] The Plaintiffs and the Defendant agree on what they believe the HSR Act and the FTC antitrust approval process require. *See, e.g.*, Joint Proposed Finding of Fact of Pls. & Intervenor-Pl.; Def. & Countercl.-Pl.'s Proposed Finding of Fact.  I make no independent findings as to the underlying antitrust statutes or government process, and simply rely on the parties' representations.
[100] Trial Tr. 136:13–20 (Ferris).
[101] *Id.* at 136:18–20.
[102] *Id.* at 136:13–23.
[103] Pre-Trial Order ¶ II.C.18.
[104] JX 323; Trial Tr. 135:15–136:12, 136:24–137:6 (Ferris).

day waiting period, which would give the FTC more time to review their filings.[105] As a result, Buddy's and Rent-A-Center refiled under the HSR Act on August 14, 2018.[106] Nonetheless, on September 13, 2018, in response to their refilings with the FTC, Buddy's and Rent-A-Center received a second request.[107] Rent-A-Center and Vintage Capital issued a joint press release on September 13, 2018, which announced that the FTC had sent them a second request and included the expectation that the Merger would "close during the first quarter of 2019."[108]

Buddy's and Rent-A-Center subsequently entered into a joint timing agreement (the "Joint Timing Agreement") with the FTC on October 29, 2018.[109] According to the Joint Timing Agreement, Buddy's and Rent-A-Center agreed *not to close* the Merger for a forty-five day waiting period, which would, in turn, be triggered by their substantial compliance and certification of compliance with the second request they had received.[110] Buddy's and Rent-A-Center "anticipate[d] substantially complying . . . by November 15," but agreed not to certify their compliance on that date.[111] Certification would trigger deadlines for FTC action, and the parties wanted to avoid rushing the FTC into unfavorable action. Instead,

---

[105] JX 311; JX 312; Trial Tr. 138:20–139:20 (Ferris); Ressler Dep. 103:17–104:6.
[106] JX 312; JX 313.
[107] Pre-Trial Order ¶ II.C.18; s*ee also* JX 352; JX 358.
[108] Pre-Trial Order ¶ II.D.19; JX 355, at 3.
[109] Pre-Trial Order ¶ II.D.21.
[110] JX 458, at 3.
[111] *Id.*

Buddy's and Rent-A-Center agreed to a timing structure that involved the FTC making preliminary findings and engaging in a series of meet-and-confers with Buddy's and Rent-A-Center, prior to certification of compliance; that certification would trigger the agreed-upon waiting period.[112] Rent-A-Center's antitrust counsel noted to Rent-A-Center's Board that certification was expected on December 10, 2018, which would "for all practical purposes" push a conclusion to the antitrust approval process to the "end of January" 2019.[113] The Rent-A-Center Board approved Rent-A-Center entering into the Joint Timing Agreement.[114] On November 5, 2018, Rent-A-Center issued a press release regarding its third quarter 2018 financial results, which contained the same expectation that the Merger would "close during the first quarter of 2019."[115]

On November 29, 2018, counsel for Buddy's and Rent-A-Center participated in a call with the FTC, following which counsel updated their respective clients and began working on a "white paper" to explain why full divesture of Buddy's would not be necessary.[116] Buddy's and Rent-A-Center jointly submitted the white paper to the FTC on December 14, 2018.[117] Counsel for Buddy's and Rent-A-Center had

---

[112] *Id.* The forty-five day waiting period to which Buddy's and Rent-A-Center agreed could be cut short if the FTC terminated the waiting period or closed its investigation. *Id.*

[113] JX 433, at 1.

[114] *Id.*; JX 437, at 1; JX 439, at 1; JX 440, at 1; Trial Tr. 251:23–252:5 (Lentell).

[115] Pre-Trial Order ¶ II.D.22; JX 477.

[116] JX 526; JX 532; Trial Tr. 174:8–176:22 (Ferris); Agin Dep. 125:7–18.

[117] JX 600; Trial Tr. 176:23–178:2 (Ferris).

25

an additional call with the FTC on December 17, 2018; based on that call, counsel were hopeful that a full divesture of Buddy's would not be necessary, but understood that the FTC needed additional time to further study the issue. As a result, a planned in-person meeting with the FTC on December 19, 2019 was canceled.[118] At this time, Buddy's and Rent-A-Center still had not certified compliance with the second request.[119]

### 2. Financing

Vintage Capital and Rent-A-Center worked together to create financial models of the post-closing entity, to be used pre-closing by Vintage Capital and B. Riley when engaging with investors, potential investors, and rating agencies.[120] Rent-A-Center was obligated to provide assistance for the financial modeling under the Merger Agreement.[121] Rent-A-Center's Vice President of Finance, Daniel O'Rourke, was primarily responsible for the modeling and for responding to requests from Vintage Capital.[122] O'Rourke created and updated a financial model for "NEWCO," the post-merger entity, and did so with input and model assumptions from Kahn.[123] O'Rourke's original model included a "transaction close" assumption

---

[118] JX 601; Trial Tr. 190:22–192:18, 193:1–13 (Ferris).
[119] Trial Tr. 191:20–192:7 (Ferris).
[120] *See, e.g.*, Trial Tr. 33:22–35:7 (Kahn); *id.* at 328:1–14 (B. R. Riley).
[121] *See* JX 272 §§ 6.03, 6.11(f).
[122] Trial Tr. 458:24–460:8 (O'Rourke).
[123] *See, e.g.*, JX 282; Trial Tr. 460:24–462:10 (O'Rourke).

of September 30, 2018.[124]  On September 20, 2018, O'Rourke updated the financial model, changing, among other things, the assumption for "Transaction Close" from September 30, 2018 to January 31, 2019.[125]  O'Rourke received approval from both Kahn and Fadel to make this change to the financial model.[126]

On December 7, 2018, Fadel met Mr. Riley at B. Riley's Los Angeles office.[127]  Fadel first met with Great American Capital Partners, a subsidiary of B. Riley that was providing, in part, debt financing for the Merger.[128]  Fadel then met with Mr. Riley and discussed, among other things, how B. Riley might continue to be involved with the post-merger entity.[129]  On December 8, 2018, Fadel e-mailed a Rent-A-Center employee, copying Mr. Riley.[130]  Fadel wrote that "B. Riley will be a major partner in our company going forward," and B. Riley should therefore be allowed to compete for a financial services opportunity at Rent-A-Center.[131]

Given other changes in the financial model for "NEWCO," on December 11, 2018, O'Rourke asked Kahn if he should move "close timing back."[132]  Kahn gave

---

[124] JX 282; JX 369, at 6; JX 371, at 6; Trial Tr. 465:5–14 (O'Rourke).

[125] JX 369, at 6; JX 373, at 3.  The model contains a typo; "January 31, 2018" is clearly a scrivener's error, which should instead be "January 31, 2019." *See* Trial Tr. 115:17–116:5 (Kahn); O'Rourke Dep. 145:20–146:5.

[126] JX 369; JX 370; JX 371; JX 376, at 1; Trial Tr. 488:6–489:7, 489:20–490:10 (O'Rourke).

[127] Trial Tr. 327:24–329:5, 329:19–24 (B. R. Riley); *id.* at 527:8–528:1, 595:13–16 (Fadel).

[128] *Id.* at 482:11–20 (O'Rourke); *id.* at 527:8–13 (Fadel).

[129] *Id.* at 330:22–331:16, 334:1–8 (B. R. Riley); *id.* at 575:2–8 (Fadel).

[130] JX 553.

[131] *Id.*

[132] JX 573.

his approval, and O'Rourke updated the financial model with an assumption that the "Timing" of the Merger was the "End of March 2019."[133] This financial model was sent, after review by Kahn, Fadel, and B. Riley, to investors and a rating agency on December 14, 2018.[134]

### 3. Integration Planning and Rent-A-Center Operations

Rent-A-Center was also obligated under the Merger Agreement to provide support for Vintage's[135] integration of Rent-A-Center.[136] Fadel, who was expected to become the CEO of the merged entity, was involved in integration planning.[137]

Among other meetings and activities, Fadel attended an integration planning meeting in Orlando, Florida on December 10, 2018.[138] After the integration planning meeting, Fadel met with Kahn and discussed, among other things, Acceptance Now.[139] Kahn planned to find a merger partner to manage the Acceptance Now business; Fadel sought Kahn's approval at the meeting, in light of an expected closing in 2019, for ninety days to implement a change to Acceptance Now, in the hopes of keeping it wholly owned by Rent-A-Center.[140] Vintage and

---

[133] JX 589, at 49; JX 594, at 10; JX 595, at 6.

[134] JX 589, at 1; JX 594, at 5; JX 595, at 1; JX 602; Trial Tr. 488:3–489:7 (O'Rourke).

[135] Vintage in this regard includes Buddy's. *See* Trial Tr. 37:23–38:13 (Kahn); *id.* at 514:11–14 (Fadel).

[136] JX 272 §§ 6.03, 6.11(f).

[137] Trial Tr. 37:23–39:13 (Kahn); *id.* at 514:1–515:5, 539:9–11 (Fadel).

[138] *Id.* at 44:11–17 (Kahn); *id.* at 528:30–529:3 (Fadel).

[139] *Id.* at 45:24–47:23 (Kahn); *id.* at 530:5–18 (Fadel).

[140] *Id.* at 45:24–47:23, 49:2–7, 73:15–74:1 (Kahn); *id.* at 530:5–18, 579:21–580:7 (Fadel).

Rent-A-Center representatives had another integration planning meeting scheduled for December 18, 2018.[141]

Rent-A-Center had agreed in the Merger Agreement to "conduct their . . . business and operations in the ordinary course of business consistent with past practices;" conduct outside the ordinary course could only be taken "with the prior written consent of [Vintage Parent] (including by email) . . . ."[142] Rent-A-Center requested such consent from Kahn on several occasions, and received it.[143] The Rent-A-Center Board approved a transaction on December 6, 2018 that required such consent,[144] Kahn asked for documents related to the transaction,[145] and Fadel sent the documents to Kahn on December 17, 2018.[146]

*E. Termination of the Merger Agreement*

1. <u>Rent-A-Center's Board Decides to Terminate the Merger Agreement *If* Given the Opportunity</u>

Rent-A-Center held regularly scheduled Board meetings on December 5 and 6, 2018.[147] During the meetings, the Board discussed Rent-A-Center's financial and operational performance, which had improved since the Merger Agreement was

---

[141] *Id.* at 61:16–62:19 (Kahn); *id.* at 597:9–14 (Fadel).
[142] JX 272 § 5.01.
[143] Trial Tr. 30:7–32:14 (Kahn); s*ee also, e.g.*, JX 296; JX 326.
[144] JX 558.
[145] JX 652.
[146] JX 619, at 1.
[147] *See* JX 546; JX 558.

signed on June 17, 2018.[148]  Legal counsel to the Board "reminded" the Board that the Merger Agreement's "initial end date" was December 17, 2018, but could be extended by either party through written notice beforehand.[149]  Legal counsel to the Board explained that in the event Vintage did not extend, the Board would need to decide whether Rent-A-Center should extend the End Date or terminate the Merger Agreement.[150]  Legal counsel also "reminded the Board of the Provisions in the Merger Agreement relating to payment of a termination fee."[151]  The Board then determined that if Vintage Capital did not extend the End Date, it would be in the best interests of Rent-A-Center's stockholders for the Board to also not extend the End Date, and to instead terminate the Merger Agreement.[152]  The Board and legal counsel believed that Rent-A-Center would receive written notice electing to extend the End Date from Vintage Capital before the Section 8.01(b)(i) deadline, that is, before midnight Eastern Time on December 17, 2018.[153]  In the meantime, the Board decided that Rent-A-Center's management "should continue with its efforts to consummate the merger."[154]  The determination by the Board to terminate the

---

[148] JX 546, at 1; *see also* JX 556.
[149] JX 546, at 2.
[150] *Id.*
[151] *Id.*
[152] JX 546, at 2; JX 558, at 4; Trial Tr. 384:6–24 (Ressler); Trial Tr. 519:2–11, 519:23–521:21 (Fadel); Brown Dep. 50:21–51:3, 56:15–57:14.
[153] Trial Tr. 404:24–405:8 (Ressler); *id.* at 519:17–22, 555:4–5, 577:10–19 (Fadel); s*ee also* Hetrick Dep. 133:20–134:6.
[154] JX 558, at 4.

Merger Agreement, if given the opportunity, was kept confidential.[155] For example, Rent-A-Center's General Counsel was not told of this decision until December 14, 2018, and O'Rourke was not told until December 17, 2018.[156]

As previously described, following the December 5 and 6, 2018 Rent-A-Center Board meetings, Vintage and Rent-A-Center continued to work together toward antitrust approval, integration planning, and arranging financing for the Merger. Specific actions that took place after the December 5 and 6 Board meetings included joint discussions with the FTC, Fadel's in-person meetings with Kahn and B. Riley, exchanging information, financial modeling, and integration planning. During the course of these joint interactions, the Rent-A-Center Board's discussions and its decision to terminate the Merger Agreement, if given the opportunity, were not shared with anyone from the Vintage Entities or B. Riley.[157]

Rent-A-Center's Board held a special meeting at 9 p.m., Eastern Time, on December 17, 2018.[158] Legal counsel to Rent-A-Center and legal counsel to its Board[159] told the Board that they had not yet received a notice to extend the End Date in accordance with the Merger Agreement, which extension, under the Merger

[155] Trial Tr. 389:6–14, 411:16–18 (Ressler); *id.* at 533:15–18 (Fadel).
[156] *Id.* at 275:17–258:10 (Korst); *id.* at 483:13-16 (O'Rourke). The Board also did not tell Rent-A-Center's antitrust counsel. *Id.* at 584:5–7 (Fadel).
[157] *See, e.g.*, *id.* at 50:19–51:2, 58:2–7, 59:21–61:6, 61:4–15 (Kahn); *id.* at 333:5–10 (B. R. Riley); *id.* at 582:6–12 (Fadel).
[158] JX 617.
[159] Legal counsel were required recipients of notice under Section 9.02. *See* JX 272 § 9.02.

31

Agreement, must be made, if at all, by 11:59 p.m. that night.[160]  During the special meeting, the Board "reviewed their previous discussions regarding [Rent-A-Center]'s strong financial performance and outlook, as well as their view that terminating the Merger Agreement was in the best interest of the Company's stockholders."[161]  The Board resolved to terminate the Merger Agreement and demand the Parent Termination Fee if Rent-A-Center did not receive an extension notice before the deadline in the Merger Agreement.[162]

### 2. Rent-A-Center Purports to Terminate the Merger Agreement

On December 18, 2018, shortly after midnight, Rent-A-Center's General Counsel[163] advised the Board that he had "not received any communication from Vintage or Vintage attorneys."[164]  As a result, at 6:55 a.m., Eastern Time, on December 18, 2018, Fadel e-mailed Kahn a "notice of termination and demand for payment" (the "Termination Notice").[165]  The Termination Notice indicated that Rent-A-Center was "exercising its right to terminate the Merger Agreement pursuant to Section 8.01(b)(i) thereof, effective immediately."[166]  The Termination Notice

---

[160] JX 617, at 1.
[161] *Id.*
[162] *Id.*
[163] Rent-A-Center's General Counsel was a required recipient of notice under Section 9.02. *See* JX 272 § 9.02.
[164] JX 646.
[165] JX 660.
[166] *Id.*

also demanded payment of the $126.5 million Parent Termination Fee.[167]  At 7:00

a.m., Eastern Time, Rent-A-Center issued a press release announcing the Merger

Agreement had been terminated because Rent-A-Center had not received a notice of

election to extend and the Rent-A-Center Board, "in light of the current financial

and operational performance of [Rent-A-Center]," decided not to extend either, and

instead to terminate.[168]

Kahn responded to Fadel by letter on December 18, 2018.[169]  Kahn disputed

that the Termination Notice was valid and insisted that Rent-A-Center continue to

comply with the Merger Agreement.[170]  Rent-A-Center did not respond, nor did

Fadel respond to Kahn's other attempts to reach him.[171]

*F. Procedural History*

The Vintage Entities filed a Complaint against Rent-A-Center on December

21, 2018.  Vintage also sought a Temporary Restraining Order ("TRO") against

Rent-A-Center in an attempt to force compliance with the Merger Agreement.  I held

a TRO hearing on December 31, 2018; from the Bench, I denied in part and granted

in part the TRO.  I subsequently entered a Status Quo Order on January 7, 2019.  On

January 3, 2019, I granted B. Riley's Motion to Intervene; it filed its own Complaint

---

[167] *Id.*
[168] JX 627.
[169] JX 657.
[170] *Id.*
[171] Trial Tr. 41:4–41:7 (Kahn).

against Rent-A-Center on the same day. On January 8, 2019, Rent-A-Center filed a Counterclaim. The parties pursued discovery and trial on an expedited schedule. Trial took place over two days on February 11 and 12, 2019. I heard Post-Trial Oral Argument on March 11, 2019.

## II. ANALYSIS

Plaintiffs Vintage Capital, Vintage Parent, and Vintage Merger Sub seek declaratory judgment, and bring claims for breach of the implied covenant of good faith and fair dealing and estoppel—all, in one way or another, to prevent Rent-A-Center's termination of the Merger Agreement. They also bring a claim for breach of contract and specific performance to enforce the Merger Agreement. Intervenor-Plaintiff B. Riley seeks declaratory judgment on several counts, which are largely duplicative of the relief the Vintage Entities ask for, with the exception of a request for a declaratory judgment that the Parent Termination Fee is an unenforceable penalty. The Vintage Entities and B. Riley are collectively referred to below as "the Plaintiffs." Defendant Rent-A-Center has brought a counterclaim for breach of contract, seeking payment of the Parent Termination Fee. I begin with the contractual claims surrounding the termination of the Merger Agreement.

> A. *Rent-A-Center Had the Right to Terminate the Merger Agreement Pursuant to Section 8.01(b)(i)*

The Plaintiffs did not introduce evidence at trial, nor do they argue, that they sent a written notice of election to extend to Rent-A-Center that explicitly used the

term "End Date" or otherwise referenced Section 8.01(b)(i) of the Merger Agreement or the date March 17, 2019. Nor do they argue that they sent any document that could be construed as a written notice of election to extend in a manner compliant with the Merger Agreement, which required notice to Rent-A-Center to be delivered personally or sent by fax or email to Rent-A-Center's General Counsel and certain of Rent-A-Center's outside counsel. The Plaintiffs do, however, argue that Rent-A-Center's termination of the Merger Agreement pursuant to Section 8.01(b)(i) was not valid. The Plaintiffs seek declaratory judgment and put forward four contractual arguments that the End Date had been extended before termination, or that Rent-A-Center had waived notice: first, that the purpose of the notice requirement in Section 8.01(b)(i) of the Merger Agreement was satisfied, and no "additional"[172] notice was therefore required; second, that Rent-A-Center extended or waived the notice requirement of Section 8.01(b)(i) in accordance with Section 8.05; third, that if notice of election to extend was required, a financial model prepared by Rent-A-Center itself listing a "Transaction Close" date of January 31, 2019 fulfilled the notice requirement and complied with the general provision on notice in Section 9.02; and fourth, that Rent-A-Center did not have the right to terminate the Merger Agreement under Section 8.01(b)(i) because it had breached the Merger Agreement by failure to employ commercially reasonable efforts toward

---

[172] Post-Trial Answering Brief of Pls. and Intervenor-Pl. at 7.

the closing. The Plaintiffs, as the parties seeking declaratory judgment, assume the burden of proving their position.[173] The Plaintiffs also argue that if Rent-A-Center had the right to terminate under Section 8.01(b)(i), the implied covenant of good faith and fair dealing prevents Rent-A-Center from exercising that right. I begin with the clear and unambiguous language of the Merger Agreement itself, before addressing the Plaintiffs' arguments in turn.

1. The Merger Agreement and the End Date

The provisions of the Merger Agreement at issue are clear and unambiguous,[174] and all the provisions are assumed to have meaning.[175] As parties to the Merger Agreement, Vintage and Rent-A-Center are assumed to have knowledge of the terms of the contract that they bargained for and entered into.[176] The Merger Agreement binds the parties until its termination; Section 8.01 details various rights to terminate, but the Merger Agreement would also "terminate" after a successful closing of the Merger. While bound, the parties agreed to use

---

[173] *In re Oxbow Carbon LLC Unitholder Litig.*, 2018 WL 818760, at *50 (Del. Ch. Feb. 12, 2018), *aff'd in part rev'd in part sub nom. Oxbow Carbon & Minerals Hldgs., Inc. v. Crestview-Oxbow Acq., LLC*, 2019 WL 237360 (Del. Jan. 17, 2019).

[174] The parties also agree that the language is clear and unambiguous. *See* Post-Trial Answering Br. of Pls. and Intervenor-Pl. at 5 ("Quite the opposite, the parties agree on the meaning of the clear words of Section 8.01(b)(i) . . . .").

[175] *See Kuhn Constr., Inc. v. Diamond State Port Corp.*, 990 A.2d 393, 396–97 (Del. 2010) ("We will read a contract as a whole and we will give each provision and term effect, so as not to render any part of the contract mere surplusage.").

[176] *See, e.g., Chapter 7 Tr. Constantio Flores v. Strauss Water Ltd.*, 2016 WL 5243950, at *6 (Del. Ch. Sept. 22, 2016) ("[A] party who enters into a contract governed by Delaware law will be charged with knowledge of the contents of the instrument and will be deemed to have knowingly agreed to the plain terms of the instrument absent some well-pled reason to infer otherwise.").

36

commercially reasonable efforts to work toward closing, as well as for obtaining antitrust approval, for integration planning, and for achieving financing for the transaction.

Section 8.01(b)(i) of the Merger Agreement states that the "End Date" of the Merger Agreement is "11:59 p.m., Eastern Time, on December 17, 2018."[177] If the Merger is not consummated by the End Date, either Vintage or Rent-A-Center have the right, but not the obligation, to terminate the Merger Agreement upon written notice. Either party, however, can elect to extend the End Date to March 17, 2019, if FTC approval has not yet been achieved, *and* if the party electing to extend delivers written notice of its election to the other party by 11:59 p.m., Eastern Time, on December 17, 2018. Section 9.02 of the Merger Agreement governs notices and, relevant here, specifies the names and addresses of the recipients of such notices. Extension of the End Date is not permissible if there is a "Legal Restraint" that "makes the Merger illegal or otherwise prevents the consummation of the Merger . . . ,"[178] or "[a]ny applicable waiting period under the HSR Act shall have expired or been earlier terminated and all other required consents under any Antitrust Laws shall have been obtained."[179] Those conditions did not obtain here, and either party was entitled to file a notice of election to extend, upon which the obligations of the

---

[177] JX 272 § 8.01(b)(i).
[178] *Id.* § 7.01(c).
[179] *Id.* § 7.01(b).

Merger Agreement would be binding on all parties until the new End Date. In other words, the Merger Agreement creates a reciprocal, unilateral right to extend the End Date.

Therefore, each party to the Merger Agreement was faced with a decision concerning the End Date in Section 8.01(b)(i), and had to make that decision in accordance with the following decision matrix. The party could elect to extend the End Date, and thereby bind itself and its counterparty to the Merger Agreement until at least March 17, 2019,[180] or the party could choose not to extend the End Date, at which point its options were contingent on its counterparty. If its counterparty chose to extend, then the first party had no choice—it would remain bound by the Merger Agreement. If the counterparty did not elect to extend, the party could terminate the Merger Agreement at any time after the End Date. If both parties did not elect to extend but also both chose not to immediately exercise their termination rights, then both parties would continue to be bound by the Merger Agreement, *but* by their own volition and with the understanding that either party could terminate at will.

Rent-A-Center was faced with this decision matrix during its December 5 and 6, 2018 Board meetings. The Board knew that Vintage had the unilateral right to bind Rent-A-Center to the Merger Agreement until at least March 17, 2019. The

---

[180] The parties could extend the End Date again to the further and final End Date of June 17, 2017. *Id.* § 8.01(b)(i).

record shows that the Rent-A-Center directors did not believe that Vintage had already effected an election to extend the End Date; their discussion would otherwise have been moot, as the right to extend was unilateral. Rent-A-Center's Board also believed that it would likely receive a written notice from Vintage electing to extend the End Date.[181] However, from the Board's perspective, it had no assurance that Vintage would definitely make such an election, nor does the record show that *Rent-A-Center* had reason to believe that Vintage did not also think it was faced with the same decision matrix. Rent-A-Center's Board, then, late in the process but appropriately, considered the options available to Rent-A-Center under Section 8.01(b)(i) and made the decisions that it found to be in the Company's best interest. It decided not to extend the End Date. Furthermore, the Rent-A-Center Board decided that, should Vintage not bind Rent-A-Center through an election to extend, the Board would exercise its right to terminate immediately after the End Date and walk away from the Merger. This litigation is the result of that decision.

### 2. The Joint Timing Agreement Was Not An Election to Extend the End Date

Section 8.01(b)(i) of the Merger Agreement requires written notice of election to extend the End Date. Section 9.02 details how and to whom notices must be sent. The Plaintiffs, nonetheless, contend that under the circumstances a written notice—

---

[181] *See, e.g.*, Trial Tr. 404:24–405:8 (Ressler); *id.* at 519:17–22 (Fadel).

in accordance with Section 9.02—of election to extend the End Date was not required because "the purpose of [the] contractual notice requirement" had already been satisfied.[182]  The Plaintiffs' reasoning is as follows: the purpose of Section 8.01(b)(i) was to "define the parties' rights if the merger did not close by December 17, 2018 due to the ongoing FTC clearance process,"[183] and this purpose is satisfied by an [implicit] election to extend the End Date and notice to the other party of that election.[184]  The Plaintiffs suggest that the true purpose of Section 8.01(b)(i) is to provide notice that the counterparty intends to go forward towards closing, post-End Date.  The purpose evidenced by the clear and unambiguous language of Section 8.01(b)(i) is, to my mind, different:  It is to give notice that the counterparty has elected to bind itself, and the party receiving notice, to the strictures of the Merger Agreement pending the extended End Date.

The Plaintiffs argue that the Joint Timing Agreement, in addition to other communications between the parties, represented notice[185] to Rent-A-Center that the Plaintiffs had *elected* to extend the End Date, because the parties represented to the FTC therein that closing would not take place until after the End Date.  Since any

[182] Written Closing Argument of Pls. and Intervenor-Pl. at 3.

[183] Post-Trial Answering Br. of Pls. and Intervenor-Pl. at 6 (quoting Def. and Counterclaim-Pl. Rent-A-Center's Opening Post-Trial Br. at 17).

[184] *Id.*

[185] The Plaintiffs go so far as to claim that the Defendant has "actual knowledge" of the election to extend. Written Closing Argument of Pls. and Intervenor-Pl. at 11; Post-Trial Answering Br. of Pls. and Intervenor-Pl. at 6.

closing would be post-End Date, per the Plaintiffs, this must represent an election to extend, thus satisfying the purpose of Section 8.01(b)(i).[186] According to the Plaintiffs, once the purpose was satisfied, there was no obligation to provide "separate" or "additional" notice in literal compliance with Section 8.01(b)(i) and Section 9.02's specific requirements regarding recipients.[187]

First, I note that Rent-A-Center bargained for a right in the Merger Agreement: the right to cancel the merger after six months unless Vintage gave written notice of election to bind itself and Rent-A-Center to an additional three-month term. The Plaintiffs essentially ask that I go beyond the written words of the provision to consider its "purpose," which, the Plaintiffs contend, if satisfied, constitutes substantial compliance, negating the need for literal compliance.[188] However,"[c]ontracts are to be interpreted as written,"[189] which is why judicial review generally stops if the terms are clear and unambiguous.[190] In order to deviate from clear and unambiguous contract terms without consequence, a party must justify its deviation, by, for instance, showing that it has acted reasonably, in light of the circumstances, to substantially comply in a way that preserves the benefits of

---

[186] Post-Trial Answering Br. of Pls. and Intervenor-Pl. at 6–7.
[187] *Id.* at 7.
[188] Written Closing Argument of Pls. and Intervenor-Pl. at 11.
[189] *Willie Gary LLC v. James & Jackson LLC*, 2006 WL 75309, at *5 (Del. Ch. Jan. 10, 2006), *aff'd*, 906 A.2d 76 (Del. 2006).
[190] *See Gildor v. Optical Sols., Inc.*, 2006 WL 4782348, at *6 (Del. Ch. June 5, 2005) ("The language of [the notice provision] is clear and unambiguous, which means that the language alone would typically dictate the outcome.").

41

the contract to the counterparty.[191]  To the extent a reviewing court contemplates

condoning such deviation, it must be scrupulous to preserve the benefits of the

counterparty's bargain.

In that regard, this Court has, at times, accepted substantial compliance with

notice provisions in lieu of literal compliance,[192] when the circumstances so

justified.[193]  The Court's precedent on substantial compliance with notice provisions

focuses almost entirely on the *manner* in which notice was provided.[194]  The

Plaintiffs here argue that the Court should find substantial compliance not only in

the *manner* in which notice was given, but also in the *substance*.  They argue that

---

[191] For example, in *Corporate Property Associates 6 v. Hallwood Group Inc.*, this Court found substantial compliance with a notice provision when the executive designated to receive notice had left the company—making literal compliance impossible—but executives at the receiving company did receive and review the notice. 792 A.2d 993, 1000–01 (Del. Ch. 2002), *rev'd on other grounds*, 817 A.2d 777 (Del. 2003).

[192] As then-Vice Chancellor Strine explained, "when confronted with less than literal compliance with a notice provision, courts have required that a party substantially comply with the notice provision.  The requirement of substantial compliance is an attempt to avoid 'harsh results . . . where the purpose of these [notice] requirements has been met.'  When literal compliance is not possible, that is a sensible rule, and it is one which would not require [the defendant] to search to the ends of the world for [the plaintiff].  Substantial performance is 'that which, despite deviations from contract requirements, provides the important and essential benefits of the contract.'" *Gildor*, 2006 WL 4782348, at *7 (internal quotations and citations omitted).

[193] In *PR Acquisitions, LLC v. Midland Funding LLC*, the Defendant argued that the Plaintiff had received actual notice and that the notice provision did not require strict compliance. 2018 WL 2041521, at *6 (Del. Ch. Apr. 30, 2018).  This Court, after reviewing prior case law, rejected the defendant's arguments on notice, writing "[the defendant] offers no reason other than its own error for its failure to comply with the notice provision it negotiated." *Id.* at *7.

[194] For example, in *Gildor v. Optical Solutions, Inc.*, the notice provision did not contain an address for a required recipient, making literal compliance impossible; this Court found that substantial compliance would have sufficed. 2006 WL 4782348, at *6–9.  Additionally, in *Kelly v. Blum*, the Court found that notice sent by fax and a confirmation copy by *overnight commercial delivery* substantially complied with the notice provision, which required fax and a confirmation copy on the same day by *first class mail*. 2010 WL 629580, at *8 (Del. Ch. Feb. 24, 2010).

implicit in Vintage's actions, such as Vintage causing Buddy's to enter the Joint Timing Agreement, was Vintage's intent to close after the End Date, thus putting Rent-A-Center on notice of Vintage's desire to go forward to closing beyond the End Date. In the Plaintiffs' view, this made contractual notice a meaningless formality. Again, however, the notice of election to extend had a different purpose: to bind the parties after the End Date.

The Joint Timing Agreement, as testimony made clear, was an attempt by the parties to encourage a favorable outcome from the FTC. By agreeing *not to close* for a period, the parties gave the FTC, which was otherwise under a time constraint, a chance to consider the parties' argument that less than full divestiture of Buddy's was necessary. By agreeing not to close, however, the parties were not binding one another past the End Date. If Vintage had found it in its business interest to do so, it could have terminated the agreement after the End Date, unless Rent-A-Center elected to extend. The reciprocal must be true. It is worth pointing out that, even if *neither* party elected to extend, the parties could nonetheless have gone forward to a closing after the End Date, consistent with the Joint Timing Agreement. Under Section 8.01(b)(i), the Merger Agreement remained in force until notice of termination. Contractually, the parties could have gone forward to closing after the End Date. Each would have done so suffering the daunting uncertainty of knowing

43

that the counterparty could terminate at will, but with the advantage that the party itself could cancel if a change in circumstances warranted.

In addition to the Joint Timing Agreement itself, the Plaintiffs point to all the other actions and expense they devoted to moving toward a closing. They argue that Rent-A-Center must have known the Vintage intended to extend, because no reasonable party would have undertaken the effort Vintage did without that intention. But Rent-A-Center itself did that very thing. Both parties had a bargained-for right to terminate the agreement at any time after the End Date, unless the counterparty elected to extend. All the Plaintiffs really point to is that market conditions changed in a way that made it attractive only for Rent-A-Center to terminate. However, nothing in the parties' changed financial circumstances, the Joint Timing Agreement, or the other actions of the parties is a replacement for a notice of election to extend the End Date.

Finally, I note that much, if not all, of the effort Vintage expended toward closing was required contractually; both parties were required to use commercially reasonable efforts to obtain FTC permission and otherwise advance the merger. If undertaking contractually-required action to consummate the merger is the equivalent of an election to extend the End Date, bind the counterparty, and give

notice thereof, the notice of election to extend requirement of Section 8(b)(i) is meaningless.  I must avoid such an interpretation of contractual language.[195]

The parties bargained for a reciprocal, unilateral right to extend the End Date of the Merger Agreement via written notice of election to exercise that right.  The parties could have written Section 8.01(b)(i) to provide for automatic extension of the End Date if the Merger was still under antitrust review, or the parties could have imposed a different standard of notice, but they did not.  They are bound by their contract.

### 3. The Notice Requirement in Section 8.01(b)(i) Was Not Extended or Waived by the Joint Timing Agreement

The Plaintiffs argue that they were not required to provide notice of election to extend the End Date according to Section 8.01(b)(i) of the Merger Agreement because the Defendant agreed, pursuant to Section 8.05, to extend the time to submit the notice and/or waived the requirement to submit the notice at all.  According to Section 8.05, an agreement of extension or waiver is only valid if "set forth in an instrument in writing signed on behalf of" the party agreeing to extend or waive.[196] According to the Plaintiffs, the Defendant signed such an instrument in writing when it agreed to the Joint Timing Agreement.  Furthermore, the Plaintiffs argue, "an

---

[195] *See O'Brien v. Progressive N. Ins. Co.*, 785 A.2d 281, 287 (Del. 2001) ("Contracts are to be interpreted in a way that does not render any provisions 'illusory or meaningless.'") (internal quotations and citations omitted).

[196] JX 272 § 8.05.

instrument in writing" is not subject to the general notice requirements in Section 9.02; that is, it need not be sent to specific individuals of the counterparty.[197]

I have found above that the Joint Timing Agreement, as well as similar agreements, actions, and communications, did not function as an election to extend the End Date. For the same reasons, to the extent that the Joint Timing Agreement *could* serve as an extension or waiver under Section 8.05 of the End Date itself,[198] it is not such an extension or waiver.

As an initial matter, the Joint Timing Agreement governs the relationship between the FTC, on one side, and Vintage[199] and Rent-A-Center, on the other side. The Joint Timing Agreement says nothing of the Merger Agreement or the relationship between Vintage and Rent-A-Center, although it certainly has implications for the Merger. The Merger Agreement requires a writing to work an extension or waiver, and that requirement implies an explicit, not implicit, release of such rights.[200] Furthermore, even *implicit* references to obligations or agreements

---

[197] *Id.*

[198] I use "could" because it is not clear that Section 8.05 can be used to extend or waive the End Date. Section 8.05(a) allows for the extension of the "the time for the performance of any of the *obligations or other acts of the other parties*" and Section 8.05(c) allows for the waiver of "compliance with any *covenants and agreements* contained" in the Merger Agreement. *Id.* § 8.05(a), (c) (emphasis added). The right to extend the End Date in Section 8.01(b)(i), does not obviously qualify as an obligation, an act, a covenant, or an agreement in the Merger Agreement. I assume, however, for purposes of this analysis that waiver or extension are available here.

[199] It is, in fact, Buddy's, and not Vintage, that is a party to the Joint Timing Agreement.

[200] *See, e.g.*, *Simon-Mills II, LLC v. Kan Am USA XVI Ltd. P'ship*, 2017 WL 1191061, at \*34 (Del. Ch. Mar. 30, 2017) ("The standard for demonstrating waiver is 'quite exacting;' because waiver is redolent of forfeiture, 'the facts relied upon to demonstrate waiver must be unequivocal.'") (quoting *Amirsaleh v. Bd. of Trade of City of N.Y., Inc.*, 27 A.3d 522, 529 (Del. 2011)).

related to Section 8.01(b)(i) are lacking in the Joint Timing Agreement. As explained in detail above, a promise to the FTC not to close before the End Date is not an implicit election to extend the End Date.

I accept, as do the parties, that the Joint Timing Agreement functions to push the *anticipated* time of closing into 2019. The Joint Timing Agreement, however, is not the equivalent of a promise that a post-End Date closing shall occur and that the parties agree to be bound by the Merger Agreement until that time. An actual extension or waiver of the right to notice of election to extend the End Date would extend the time in which both parties are definitively bound by the Merger Agreement. I find that Rent-A-Center never expressed in writing such an intent, and that it did not waive its right to terminate the Merger Agreement post-End Date.

### 4. The Notice Requirement in Section 8.01(b)(i) Was Not Otherwise Satisfied

The Plaintiffs argue that if written notice in literal compliance with Section 8.01(b)(i) was required to elect to extend the End Date, this requirement was satisfied—not by Vintage, but by Rent-A-Center itself. On September 24, 2018, O'Rourke of Rent-A Center sent a financial model of "NEWCO" to Kahn. The financial model had an assumption for "Transaction Close" of January 31, 2019 that was an update from an earlier version, which listed a close date of September 31, 2018. Fadel approved the change in the closing date assumption of the financial model, and knew that the financial model would be sent to Kahn. The Plaintiffs

47

contend that when O'Rourke sent the financial model to Kahn, Rent-A-Center effectively gave a written notice of election to extend the End Date, because the closing date assumption was past the End Date. The Plaintiffs further argue this "written notice" complied with Section 9.02, because Kahn was one of the designated recipients in Section 9.02—although so were certain of Vintage's attorneys. In other words, Vintage argues that Rent-A-Center bound both Vintage *and itself* by creating the financial model, and sending it to Vintage. For the same reason I have rejected the Plaintiffs' arguments regarding the Joint Timing Agreement, this argument fails.[201] Rent-A-Center's statement that it expected closing to occur in 2019 is not contractual notice extending the End Date. I do not find that Rent-A-Center sent Vintage written notice of its own election to extend through O'Rourke's financial model.

### 5. Rent-A-Center Did Not Lose Its Contractual Right to Terminate Under Section 8.01(b)(i)

According to the Merger Agreement, a party does not have the right to terminate under Section 8.01(b)(i) if that party has breached the Merger Agreement and its breach "cause[d] the failure of the Closing to be consummated by the End Date."[202] The Plaintiffs argue that the Defendant failed to use commercially

---

[201] The financial model, including the assumption on time of closing, was also required by the Merger Agreement because Rent-A-Center had agreed to use commercially reasonable efforts to help Vintage achieve financing for the Merger. *See generally* JX 272 § 6.11.
[202] *Id.* § 8.01(b)(i).

reasonable efforts to consummate the Merger, and thus cannot exercise the right to terminate pursuant to Section 8.01(b)(i). The Plaintiffs base their allegation of breach on the fact that the Defendant did not tell them that the Rent-A-Center Board had resolved to terminate the Merger if it did not receive a written notice electing to extend the Merger Agreement. The Plaintiffs not only allege a failure to disclose in this regard, but also claim that the Defendant took affirmative action to conceal, which they contend conflicts with Rent-A-Center's obligation to use commercially reasonable efforts.

The Plaintiffs argue that Rent-A-Center's efforts and actions in support of the merger—at least, after the Board's termination decision at the December 5 and 6, 2018 Board meetings—were deceptive, because its "business as usual" conduct hid the fact that Rent-A-Center did not believe that the End Date had been previously extended. The Plaintiffs suggest that if they had known that Rent-A-Center did not consider the End Date extended, then they would have re-read the Merger Agreement, recognized the upcoming termination of the period in which to elect to extend, and sent the required written notice. In support of their argument, the Plaintiffs compare their situation to those in *Williams Companies. v. Energy Transfer Equity, L.P.*[203] and *Hexion Specialty Chemicals., Inc. v. Huntsman Corp.*[204]

[203] 159 A.3d 264 (Del. 2017).
[204] 965 A.2d 715 (Del. Ch. 2008).

In both *Williams* and *Hexion*, a party to a merger agreement was obligated to use its reasonable best efforts[205] to achieve a condition precedent to the contemplated merger; when the party became aware of a problem that threatened the condition precedent, however, the party stayed silent and did not share its concern with its counterparty.[206] In *Hexion*, the "reasonable best efforts" clause "impose[d] obligations to take all reasonable steps to solve problems and consummate the transaction."[207] In *Williams*, our Supreme Court wrote that the "reasonable best efforts" and "commercially reasonable efforts" clauses "placed an affirmative obligation on the parties to take all reasonable steps to obtain the [condition precedent] and otherwise complete the transaction."[208] The Plaintiffs point to the inescapable fact that, as the minutes ticked down to the passing of the End Date, Rent-A-Center's principals watched Vintage closely. Rent-A-Center personnel

---

[205] In *Williams*, the party was obligated to use both "reasonable best efforts" and "commercially reasonable efforts." 159 A.3d at 273.

[206] In *Williams*, where the contemplated merger was conditioned on the issuance of a tax opinion by the defendant's counsel; the Supreme Court found that there was evidence that the defendant did not use reasonable best efforts where the defendant "did not direct [its counsel] to engage earlier or more fully with [the plaintiff's] counsel, failed itself to negotiate the issue directly with [the plaintiff], failed to coordinate a response among the various players, went public with the information that [its counsel] had declined to issue the [tax opinion], and generally did not act like an enthusiastic partner in pursuit of consummation of the [Merger Agreement]." 159 A.3d at 273 (quoting *Williams Cos. v. Energy Transfer Equity, L.P.*, 2016 WL 3576682, at *17 (Del. Ch. June 24, 2016)). In *Hexion*, where the contemplated merger was conditioned on financing, the buyer did not use reasonable best efforts when it developed concerns about the solvency of the combined entity, but instead declined to share those concerns. 965 A.2d at 755–756; s*ee also Williams*, 159 A.3d at 272 (discussing *Hexion*).

[207] *Williams*, 159 A.3d at 272 (discussing *Hexion*).

[208] *Id.* at 273.

acted entirely in the corporate interest, anticipating the stroke of midnight, when Rent-A-Center's termination right would ripen and could be exercised. A friendly heads-up, argues Vintage, would have allowed it to bind Rent-A-Center to the Merger Agreement, going forward.

Here, according to the Plaintiffs, the Defendant breached its obligation to use commercially reasonable efforts by not informing Vintage that Rent-A-Center considered the operative End Date to be the initial End Date defined by the Merger Agreement—that is, December 17, 2018. The result, per the Plaintiffs, was that Vintage was not put on notice of its need to comply with the notice requirement in Section 8.01(b)(i). *Williams* and *Hexion* are, I find, distinguishable from the case before me. The defendants in those cases were aware of a "problem," impending failure to obtain a condition precedent, and chose not to make the effort to alert, and to work with, their counterparties. The "problem" posed by the Plaintiffs here is not the sabotage of achieving a condition precedent to the Merger, but Vintage's lack of understanding of its explicit rights under the Merger Agreement. Under Delaware Law, parties are assumed to have knowledge of their own contractual rights.[209] For *Williams* and *Hexion* to be analogous here would require me to find that Rent-A-Center was aware that Vintage misunderstood its contractual rights, but Rent-A-

---

[209] *See, e.g.*, *Chapter 7 Tr. Constantio Flores v. Strauss Water Ltd.*, 2016 WL 5243950, at *6 (Del. Ch. Sept. 22, 2016).

Center nonetheless chose not to raise the confusion with its counterparty.[210] I need not decide whether, in such a case, failure to raise the issue would violate Rent-A-Center's duty to use commercially reasonable efforts, because the record fails to demonstrate that the Defendant had such knowledge.

The record is bereft of any evidence that the Rent-A-Center Board had knowledge Vintage was mistaken as to its contractual right to extend the End Date by giving notice.[211] In fact, testimony at trial indicates that the Board was told, and believed, that Rent-A-Center was likely to give notice before the end date.[212] The Plaintiffs argue that the Defendant's behavior was nonetheless fraudulent or deceptive, and that this is therefore evidence that Rent-A-Center knew Vintage was

---

[210] I note that I am faced here with the exercise of a contractual right, and not compliance with contractual commitments. To the extent that precedent provides guidance here, I find helpful the analysis of "reasonable best efforts" (presumably also applicable to "commercially reasonable efforts") described in *Akorn, Inc. v. Fresenius Kabi AG*, 2018 WL 4719347, at *91 (Del. Ch. Oct. 1, 2018), *aff'd*, 198 A.3d 724 (Del. 2018). In *Akorn*, this Court described the analysis of "reasonable best efforts" as "whether the party subject to the clause (i) had reasonable grounds to take the action it did and (ii) sought to address problems with its counterparty." *Id.* This Court also noted that prior decisions "criticized parties who did not raise their concerns before filing suit, did not work with their counterparties, and appeared to have manufactured issues solely for purposes of litigation." *Id.* (internal citations omitted).

[211] The Plaintiffs argue that the Chairman of Rent-A-Center admitted at his deposition that given the extension of the closing date in the Joint Timing Agreement, the End Date had to be extended. Written Closing Argument of Pls. and Intervenor-Pl. at 17–18. However, the Plaintiffs quote from the question posed by counsel, not the Chairman's response. *See* Written Closing Argument of Pls. and Intervenor-Pl. at 17–18; Lentell Dep. 157:3–7. The Chairman, in fact, answered, "That was the intent." Lentell Dep. 157:3–7. This is consistent with Rent-A-Center's belief that Vintage would bind them with a notice of election to extend before the deadline, not evidence that Vintage had already done so.

[212] *See, e.g.*, Trial Tr. 404:24–405:8 (Ressler); *id.* at 519:17–22 (Fadel).

working under a mistaken understanding.[213]  The Plaintiffs offer—among other documents and conduct—the "white paper," which was submitted to the FTC on December 14, 2018, as evidence of the deceit.  The Plaintiffs also offer as evidence the fact that the Board kept its conditional decision to terminate the Merger Agreement confidential, including confidential from many within Rent-A-Center who frequently interacted with Vintage, among them antitrust counsel, O'Rourke, and Rent-A-Center's General Counsel.

In the white paper the filing parties represented to the FTC that the Merger was an opportunity to "revitalize" Rent-A-Center, and that "[o]ver the last five years, [Rent-A-Center] has been experiencing declining revenues and its store count has reduced significantly because it has closed underperforming stores."[214]  This representation was literally true; the Plaintiffs, however, submit it was deceitful, indeed it is the quintessence of their fraud claim, because Rent-A-Center's operational performance had, in fact, recently improved, and the Board had, by this time, decided it was in the corporate interest to terminate the Merger, if given the opportunity, and proceed without Buddy's and Vintage.  Per the Plaintiffs, the white paper is evidence of Rent-A-Center's active deception.  I find the facts otherwise.

---

[213] The Plaintiffs seek to shoehorn this deception under the commercially reasonable efforts rubric—I suspect, because Vintage's behavior does not constitute actionable legal fraud.
[214] JX 600, at 21.

53

Prior to submitting the white paper, I note, Rent-A-Center's counsel informed *Vintage* that the white paper's comment on declining operational performance no longer reflected Rent-A-Center's operations, which had turned for the better, and that the white paper argument had thus lost some of its force.[215] If the statement in the white paper on operational performance was misleading, it was only misleading to the FTC, not Vintage. I find no fraud or deceit as to Vintage in the white paper, or in similar documents and conduct.

The Plaintiffs also contend that the Board's decision to keep the plan to terminate confidential is evidence that Rent-A-Center knew that Vintage was mistaken about the extension of the End Date. According to this view, by keeping their decision confidential, the Board hoped to avoid tipping off Vintage, which supposedly the Board knew would, if clued in, timely perfect its unilateral right to extend the End Date through compliance with Section 8.01(b)(i). However, the Plaintiffs' only evidence of this theory is the fact that the Board kept the plan to terminate confidential.

Fadel testified at trial that decisions made by the Board during executive sessions are, by nature, confidential.[216] There are also business reasons why the Board may have chosen to keep this specific decision confidential. Legal counsel

---

[215] JX 1215, at 1 ("Given our recent improving financial and business performance, this argument loses some of its impact or relevance in any event . . . .").
[216] Trial Tr. 533:14–18, 555:19–23, 556:19–557:1, 567:16–22, 568:16–569:6 (Fadel).

told the Board that Vintage was likely to send written notice extending the End Date, and the Board resolved to continue working toward a close. However, had Rent-A-Center shared its desire to terminate—again, an option *only if* Rent-A-Center was given the contractual opportunity—it could have upset its merger partner and complicated their relationship going forward, as Rent-A-Center would have been bound to continue working toward a close if Vintage extended the End Date as expected. Additionally, sharing the decision—even internally—could have affected the level of effort Rent-A-Center staff put towards closing, including in ongoing interactions with the FTC, and could have put Rent-A-Center at risk of breach by falling short of using commercially reasonable efforts.

There are many possibilities as to why the Board kept its decision confidential, and the Plaintiffs have not shown that this confidentiality was to avoid "tipping off" Vintage.[217] In fact, the evidence shows that the Board was informed by counsel, and believed, that Vintage would give notice of election to extend, which implies a reasonable assumption that Vintage was aware of the End Date, its implications, and Vintage's explicit rights therewith.[218] I do not find that Rent-A-Center was aware of Vintage's mistaken belief about its contractual rights.

---

[217] Written Closing Argument of Pls. and Intervenor-Pl. at 38.
[218] I do not doubt that the Rent-A-Center Board hoped for, and welcomed, the opportunity to terminate, whether that opportunity arrived by conscious decision or inadvertence on Viintage's part.

What remains of the Plaintiffs' argument is, effectively, that commercially reasonable efforts means that Rent-A-Center had a "duty to warn."[219]  In other words, the Plaintiffs argue that a commercially reasonable effort by Rent-A-Center required notice that Rent-A-Center would not extend, and would terminate if Vintage did not extend, which would thereby remind Vintage of the impending End Date and its related rights.  Finding that commercially reasonable efforts require such notice is inconsistent with the terms of the Merger Agreement.  Section 8.01(b)(i) does not require advance notice, either of the election to extend or of termination.  Advance notice provisions, however, are common; in fact, the Merger Agreement requires a party to give advance notice before it exercises several of the other termination rights in Section 8.01 itself.[220]  As a matter of contractual interpretation, I should refrain from writing a provision into a contract when the parties could have done so themselves, but chose not to.[221]  In any event, I need not

---

[219] The Plaintiffs also suggest, in a footnote in their briefing, that the Defendant had a duty to disclose under Delaware Law, independent of its contractual obligation to use commercially reasonable efforts.  Written Closing Argument of Pls. and Intervenor-Pl. at 37 n.67.  In *In re Wayport, Inc. Litigation*, this Court wrote that "[a] duty to speak can arise because of statements a party previously made. A 'party to a business transaction is under a duty to disclose to the other party before the transaction is consummated subsequently acquired information that the speaker knows will make untrue or misleading a previous representation that when made was true.'" 76 A.3d 296, 323 (Del. Ch. 2013) (quoting Restatement (Second) of Torts § 551 (1977)).  However, no such duty to disclose attaches here; Rent-A-Center did not make a representation that it would not terminate the Merger Agreement if given the opportunity, nor did it make a representation that it considered Vintage to have already made an election to extend the End Date.
[220] *See* JX 272 §§ 5.03(d)(ii), 8.01(d), 8.01(c).
[221] *See Allied Cap. Corp. v. GC-Sun Hldgs.*, L.P., 910 A.2d 1020, 1035 (Del. Ch. 2006) ("[C]ourts should be most chary about implying a contractual protection when the contract easily could have been drafted to expressly provide for it.").

consider imposing an advance notice provision, because commercially reasonable efforts under these circumstances do not require it. The Plaintiffs argue that Rent-A-Center's apparent enthusiasm for the merger misled Vintage about Rent-A-Center's decision to terminate if possible, and that had Vintage known the truth, it might have informed itself of its contractual rights, and given notice of an election to extend. Commercially reasonable efforts do not require that sophisticated parties remind one another of their contractual rights.[222]

I have attempted, in the preceding paragraphs, to grapple with the Plaintiffs' contentions that Rent-A-Center failed to use commercially reasonable efforts. However, the Plaintiffs' argument fails for a more fundamental reason. For Rent-A-Center to lose its right to terminate under Section 8.01(b)(i), its breach must be one that causes a failure to consummate the Merger by the End Date.[223] The Defendants point out that what prevented consummation of the Merger by the End Date was the ongoing antitrust approval process, with respect to which Rent-A-

---

[222] The Plaintiffs also argue that Rent-A-Center's efforts towards closing in fact *exceeded* what was required by commercially reasonable efforts. *See* Written Written Closing Argument of Pls. and Intervenor-Pl. at 33–38. This excess was, to the Plaintiffs' eyes, deceptive. However, the Plaintiffs have not shown, or even argued, that if Rent-A-Center had displayed only the bare minimum "commercially reasonable enthusiasm," the Plaintiffs would then have been aware that Rent-A-Center did not consider the End Date extended. As a result, it makes no difference, for purposes of this analysis, whether Rent-A-Center did only what commercially reasonable efforts required, or went beyond.

[223] The right to terminate the Merger Agreement under Section 8.01(b)(i) is not available "to any party whose breach of any provision of [the Merger Agreement] causes the failure of the Closing to be consummated by the End Date." JX 272 § 8.01(b)(i).

Center was, I find, using commercially reasonable efforts. Even had the Plaintiffs demonstrated a breach of commercially reasonable efforts inhering in Rent-A-Center's failure to warn, they have, nonetheless, not shown that such a breach prevented consummation of the Merger by the End Date.

Rent-A-Center's efforts toward closing cannot be a breach of the commercially reasonable efforts provision. If Rent-A-Center had not entered into the Joint Timing Agreement, participated in meetings with Vintage, and shared financial information, it would have, by such inactions, presumably breached the commercially reasonable efforts clauses of the Merger Agreement. A party's obligation to use commercially reasonable efforts must be cabined by its bargained-for contractual rights.[224] If an agreement to use commercially reasonable efforts to comply with obligations in a contract means that a party cannot exercise its bargained-for right to terminate that contract, that bargained-for right would be illusory. The Plaintiffs have argued that the Defendant's actions after the December

---

[224] This Court expressed a similar sentiment in *Akorn*, writing that:

> [T]he parties agreed in the Reasonable Best Efforts Covenant to seek 'to consummate and make effective' the transaction that they had agreed to in the Merger Agreement on the terms set forth in that contract. They *were not committing themselves to merge at all costs and on any terms*. Instead, they were committing themselves to fulfill the contract they had signed, which contained representations that formed the basis for the transaction, established conditions to the parties' performance, and gave both sides rights to terminate under specified circumstances. As I see it, the Reasonable Best Efforts Covenant *did not require either side of the deal to sacrifice its own contractual rights for the benefit of its counterparty*.

*Akorn, Inc. v. Fresenius Kabi AG*, 2018 WL 4719347, at *91 (Del. Ch. Oct. 1. 2018) (emphasis added), *aff'd*, 198 A.3d 724 (Del. 2018).

5 and 6, 2019 Board meetings were not commercially reasonable, in a way that vitiates the termination right, because the Defendant did not share with the Plaintiffs its decision not to extend the End Date and to terminate, should Vintage not so extend. I reject this argument. Given the foregoing, I find that the Defendant retained its right to terminate the Merger Agreement under Section 8.01(b)(i).

### 6. The Implied Covenant of Good Faith and Fair Dealing Does Not Prevent Termination

As our Supreme Court has recognized, "the implied covenant attaches to every contract."[225] It is "the doctrine by which Delaware law cautiously supplies terms to fill gaps in the express provisions of a specific agreement."[226] Caution in this regard should be underscored.[227] Furthermore, a gap must exist to invoke the implied covenant, "because '[t]he implied covenant will not infer language that contradicts a clear exercise of an express contractual right.'"[228]

The Plaintiffs argue that the implied covenant of good faith and fair dealing should be applied here to prevent the Defendant from exercising its termination right under Section 8.01(b)(i), because the implied covenant provides a "no deception" term.[229] However, the Plaintiffs do not claim that Rent-A-Center committed fraud,

---

[225] *Dunlap v. State Farm Fire and Cas. Co.*, 878 A.2d 434, 441 (Del. 2005).

[226] *Allen v. El Paso Pipeline GP Co., LLC*, 2014 WL 2819005, at *10 (Del. Ch. June 20, 2014).

[227] *See NAMA Hldgs., LLC v. Related WMC LLC*, 2014 WL 6436647, at *16–17 (Del. Ch. Nov. 17, 2014).

[228] *See id.*, at *16 (quoting *Nemec v. Shrader*, 991 A.2d 1120, 1127 (Del. 2010)).

[229] Written Closing Argument of Pls. and Intervenor-Pl. at 47.

per se. What the Plaintiffs ultimately seek is equitable fairness,[230] which is not promised by the implied covenant.[231] The parties vigorously negotiated the right to extend the End Date—a right that Vintage had, but failed to exercise. There is simply no gap in Section 8.01(b)(i) for the implied covenant to fill.

*B. Rent-A-Center Is Not Estopped From Exercising Its Right to Terminate*

The Plaintiffs argue, and seek declaratory judgment, that the Defendant is estopped in equity from exercising its right to terminate under Section 8.01(b)(i). The Plaintiffs argue that either equitable estoppel or quasi-estoppel bar the Defendant from exercising its termination right. Similar to their contractual arguments, the Plaintiffs base estoppel primarily on the course of conduct between the parties, which reflected an expected time of close in 2019. I assume, without finding, that in some circumstances these equitable principals could trump contract

---

[230] *See* Written Closing Argument of Pls. and Intervenor-Pl. at 49 ("This Court should, using the implied covenant, prevent that *unjust* result . . . .") (emphasis added).

[231] As Vice Chancellor Laster explained in *NAMA Holdings, LLC v. Related WMC LLC*:

> When used with the implied covenant, the term "good faith" contemplates "*faithfulness to the scope, purpose, and terms of the parties' contract.*" . . . The concept of "fair dealing" similarly refers to "a commitment to deal 'fairly' in the sense of consistently with the terms of the parties' agreement and its purpose." These concepts turn not on whether a court believes that a particular action was morally or equitably appropriate under the circumstances, but rather "*on the contract itself and what the parties would have agreed upon had the issue arisen when they were bargaining originally.*"

2014 WL 6436647, at *17 (Del. Ch. Nov. 17, 2014) (emphasis in original) (quoting *Gerber v. Enter. Prods. Hldgs., LLC*, 67 A.3d 400, 419 (Del. 2013), *overruled in part on other grounds by Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808 (Del. 2013)).

60

law, and could thus save a contract terminated under an explicit contractual right.[232] Because I find no grounds for estoppel, I need not reach that issue.

### 1. Equitable Estoppel

The Plaintiffs claim that equitable estoppel bars the Defendant from terminating the Merger Agreement. "[E]quitable estoppel is invoked 'when a party by his conduct intentionally or unintentionally leads another, in reliance upon that conduct, to change position to his detriment.'"[233] As the party asserting equitable estoppel, the Plaintiffs bear the burden of proof, which is clear and convincing evidence.[234] The Plaintiffs "must demonstrate that: (i) they lacked knowledge or the means of obtaining knowledge of the truth of the facts in question; (ii) they reasonably relied on the conduct of the party against whom estoppel is claimed; and (iii) they suffered a prejudicial change of position as a result of their reliance."[235] This Court does not lightly turn to equitable estoppel to enforce contract rights which cannot be vindicated as the contract is written.[236]

---

[232] In *Genencor International, Inc. v. Novo Nordisk A/S*, our Supreme Court, "[i]n analyzing whether the remedy [the appellant] seeks is equitable estoppel," found it "important to consider that [the apellant] is seeking to enforce a contract supported by valid consideration. 766 A.2d 8, 12 (Del. 2000). Our Supreme Court noted that it had "previously observed that a promissory estoppel analysis is not applicable to cases in which the alleged promise is supported by consideration," and "this observation also applies to equitable estoppel." *Id.* "Therefore," our Supreme Court wrote, "because this is a dispute about enforcement of a bargained-for contract right, we conclude that the remedy [the appellant] seeks is not equitable estoppel." *Id.*

[233] *Nevins v. Bryan*, 885 A.2d 233, 249 (Del. Ch. 2005) (quoting *Wilson v. Am. Ins. Co.*, 209 A.2d 902, 903–04 (Del. 1965)).

[234] *Id.*

[235] *Id.*

[236] *See Genencor Inter., Inc. v. Novo Nordisk A/S*, 766 A.2d 8, 12 (Del. 2000).

The Plaintiffs claim that they had no reason to doubt the impression they received from Fadel and O'Rourke—that Rent-A-Center remained in enthusiastic support of the merger—and had no way to discover the Board's plan to terminate the Merger Agreement. The Plaintiffs contend that they reasonably relied on Rent-A-Center's "business as usual" act following the December 5 and 6, 2018 Rent-A-Center Board meetings. The Plaintiffs' argument for equitable estoppel suffers from the same flaw as their contractual arguments: an agreement to extend the time of closing into 2019 is not agreement to extend the End Date. Fatal to the Plaintiffs' equitable estoppel claim, though, is the Plaintiffs' own ability to unilaterally extend the End Date and bind Rent-A-Center.

The Plaintiffs argue that they lacked knowledge of, or the means to obtain, the truth that Rent-A-Center did not consider the End Date extended based on the Joint Timing Agreement and other conduct between the parties. However, what Rent-A-Center believed about the End Date would have been immaterial had Vintage merely exercised its contractual right and sent a written notice explicitly extending the End Date. Vintage negotiated for this right, and was constructively aware of it. Therefore, the Plaintiffs cannot have reasonably relied on the demeanor of Rent-A-Center's principals. Nor did they change positions based on any reliance. Again, Vintage did not make a *decision* that it need not send notice of election to extend

before the End Date based on some action by Rent-A-Center.[237] It appears that Vintage simply forgot the End Date in the Merger Agreement—and its implications. The estoppel argument is another after-the-fact attempt to excuse Vintage's lack of action: Vintage did not change its position based on Rent-A-Center's actions. Vintage's attenuated claim that an honest lack of enthusiasm on the part of Rent-A-Center might have caused Vintage to read the Merger Agreement and act accordingly is another version of the misplaced duty to warn.

### 2. Quasi-Estoppel

Quasi-estoppel applies "when it would be unconscionable to allow a person to maintain a position inconsistent with one to which he acquiesced, or from which he accepted a benefit."[238] Reliance is not required for quasi-estoppel to apply.[239] However, the Plaintiffs' argument for quasi-estoppel is unavailing because the Defendant's position is consistent with its position prior to the extension of the expected time of closing. Prior to the End Date, the Defendant at all times complied with its contractual obligations to use commercially reasonable efforts. After it became clear that closing would be impossible in 2018, such efforts included working toward a closing at some uncertain time in 2019. When faced with an

---

[237] Or, if it did so, it is not reflected in the record.

[238] *RBC Cap. Mkts., LLC v. Jervis*, 129 A.2d 816, 873 (Del. 2015) (internal quotations omitted).

[239] *Barton v. Club Ventures Invs. LLC*, 2013 WL 6072249, at *6 (Del. Ch. Nov. 19, 2013).

opportunity to exercise its contractual termination right, the Defendant seized that opportunity. For the reasons explained above, these actions are not inconsistent.

### C. The Parent Termination Fee

The Plaintiffs seek declaratory judgment that the Parent Termination Fee is unenforceable. They advance arguments that the Fee is a penalty, is untethered to anticipated damages and would be a windfall to the Defendant. They also argue that the contract by, its explicit terms, does not require the Fee to be paid here. The Defendant disputes these allegations and has counterclaimed for breach of contract to force payment of the Fee. Both sides have submitted expert reports to advance their position. However, I have an additional concern: whether the Parent Termination Fee is applicable here, in light of the implied covenant of good faith and fair dealing.

The implied covenant of good faith and fair dealing, as discussed above, serves primarily to fill gaps, including providing terms so obvious that contracting parties fail to include them.[240] Such "quasi-reformation, however, 'should be [a] rare and fact intensive' exercise, governed solely by 'issues of compelling

---

[240] *See NAMA Hldgs., LLC v. Related WMC LLC*, 2014 WL 6436647, at *16 (Del. Ch. Nov. 17, 2014) ("[T]he implied covenant 'seeks to enforce the parties' contractual bargain by implying only those terms that the parties would have agreed to during their original negotiations if they had thought to address them.'") (quoting *Gerber v. Enter. Prods. Hldgs., LLC*, 67 A.3d 400, 418 (Del. 2013), *overruled in part on other grounds by Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808 (Del. 2013)).

fairness.'"[241]  "Only when it is clear from the writing that the contracting parties 'would have agreed to proscribe the act later complained of . . . had they thought to negotiate with respect to that matter' may a party invoke the covenant's protections."[242]

Despite the limited application of the implied covenant, I am dubious whether the parties meant for a reverse breakup fee to apply in this situation. Specifically, Rent-A-Center was bound through the End Date to use commercially reasonable efforts to close the Merger. The End Date was set at six months beyond the entry of the Merger Agreement, but either party could extend it another three months by giving written notice. Inadvertently, Vintage failed to notice election to extend. Rent-A-Center then exercised its right to terminate, for business reasons of its own. Immediately on learning of the termination, Vintage attempted to give notice and bind itself and Rent-A-Center to an extended End Date. It is clear that there was no gamesmanship in Vintage's actions—it simply forgot to exercise its contractual right. Vintage is ready to move to closing; it is Rent-A-Center that is causing the merger to terminate. That is Rent-A-Center's contractual right. However, I question whether the parties considered this scenario in contracting for the reverse break-up fee. As neither side has raised the applicability of the implied covenant of good faith

---

[241] *Dunlap v. State Farm Fire and Cas. Co.*, 878 A.2d 434, 441 (Del. 2005) (quoting *Cincinnati SMSA Ltd. P'Ship v. Cincinnati Bell Cellular Sys. Co.*, 708 A.2d 989, 992 (Del. 1998)).
[242] *Id.* (quoting *Katz v. Oak Industries, Inc.*, 508 A.2d 873, 880 (Del. Ch. 1986)).

and fair dealing, I request supplemental briefing, on this issue alone, before rendering a decision on whether the Parent Termination Fee must be paid.

### III. CONCLUSION

The Plaintiffs were surprised by Rent-A-Center's termination of the contract. They had expended six months of effort and considerable funds toward closing; it is understandable that they are angered by what they see as Rent-A-Center's sharp practice. However, the Plaintiffs have failed to show that the Merger Agreement's End Date was extended or that the Defendant should otherwise be barred from exercising its right to terminate. As a result, the Defendant's termination of the Merger Agreement pursuant to Section 8.01(b)(i) was valid. I reserve decision on the parties' requests for relief pertaining to the Parent Termination Fee, pending supplemental briefing.